WILENCHIK & BARTNESS
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810        Facsimile:  602-606-2811

Dennis I. Wilenchik, #005350
Lee Miller, # 012530
John D. Wilenchik, #029353
admin@wb-law.com
*Attorneys for Amicus Curaie*
*Arizona Republican Party*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizonans for Fair Elections (AZAN), an Arizona nonprofit corporation; Arizonans Fed Up with Failing Healthcare (Healthcare Rising AZ), an Arizona nonprofit corporation; and Randi L. Turk, an individual;<br><br>     Plaintiffs,<br><br>v.<br><br>Katie Hobbs, Arizona Secretary of State, Edison Wauneka, Apache County Recorder; David Stevens, Cochise County Recorder; Patty Hansen, Coconino County Recorder; Sadie Jo Bingham, Gila County Recorder; Wendy John, Graham County Recorder; Sharie Miheiro, Greenlee County Recorder; Richard Garcia, La Paz County Recorder; Adrian Fontes, Maricopa County Recorder; Kristi Blair, Mohave County Recorder; Doris Clark, Navajo County Recorder; F. Ann Rodriguez, Pima County Recorder; Virginia Ross, Pinal County Recorder; Suzanne Sainz, Santa Cruz County Reorder; Leslie Hoffman, | Case No. 2:20-cv-00658-DWL<br><br><br>**AMICUS CURAIE BRIEF**<br>**BY ARIZONA REPUBLICAN PARTY** |

Yavapai County Recorder; and Robyn Pouquette, Yuma County Recorder; all in their official capacities,

Defendants.

The Arizona Republican Party ("Amicus") hereby files this Amicus Brief for the benefit of the Court.

The Plaintiffs' request implicates extremely grave security concerns, as detailed below, and should be denied for that as well as the numerous other reasons that follow.

## I.   **Introduction**

The E-Qual (also known as "e-sign") system is currently available for candidates for statewide and legislative offices, as well as federal offices, in compliance with A.R.S. §§ 16-316, -318. Plaintiffs correctly point out that the Arizona legislature required the Secretary of State to make the E-Qual system available to candidates for local (municipal) elections as well ("candidates for city or town office, county office and the office of precinct committeeman"). However, Defendant Hobbs has failed to do so, in over a year since her election.

## II.   **E-Qual is Highly Susceptible to Fraud**

As a practical matter, the e-Qual system is highly susceptible to fraud. It has also never been used on the scale that Plaintiffs ask for.

First, for an initiative petition, the legislature has provided that signatures must be made in the presence of a circulator, who must then verify in the presence of a notary and under penalty of perjury that "each individual printed the individual's own name and address and signed this sheet…in my presence on the date indicated and I believe that each signer's name and residence address or post office address are correctly stated and that each signer is a qualified elector of the state of Arizona…and that at all times during circulation of this signature sheet a copy of the title and text was attached to the signature sheet." A.R.S. § 19-112(D).

2

On the other hand, the only "authentication" in the e-Qual system is that the user must enter a voter's name along with a corresponding driver's license number and street address. The system then checks whether the name matches the given driver's license number and street address (in the MVD system); and that is it. Whoever provided the name, driver's license number and address is shown a menu of all petitions that the voter associated with that address would be qualified to sign. The person clicks the petitions they want to "sign," clicks submit, and they are done.

The risk of fraud in that system is obvious. The system is premised on the false notion that only the voter will have access to their own driver's license number—but as any good private investigator knows, a person's name, address and driver's license number are all public record at the DMV. Anyone can easily acquire a list of Arizona voter names and driver's license numbers and addresses from the DMV and enter that information to sign petitions, or even write a program that does so automatically. And as discussed below, the e-Qual system has been so underused in reality, that an actual voter is extremely unlikely to ever actually log into the system and notice that someone signed a petition for them, i.e. to ever uncover the fraud.

The e-Qual system has never undergone a full third-party security review, because the number of signatures that are actually collected using e-Qual has historically been very small, on average between two and three percent of all signatures collected. Until 2017, there was even a statutory percentage limit (50%) on the number of signatures that a candidate could collect using e-Qual.[1] And in practice, federal and state candidates (i.e., the only possible current users of e-Qual) have obtained no more than ten percent (10%) of their signatures via e-Qual. Statewide candidates (and especially legislative candidates, who need only around one to two thousand

---

[1] *See* the 2016 bill amending A.R.S. § 16-316, "FEDERAL OFFICERS AND EMPLOYEES— NOMINATIONS—SIGNATURES," 2016 Ariz. Legis. Serv. Ch. 176 (H.B. 2050)(WEST).

signatures to qualify) typically obtain an even smaller percentage, and an even smaller number of actual e-Qual signatures (fewer than one hundred each).

However, Plaintiffs ask the Court to allow them to collect, in some cases, approximately two hundred thousand signatures electronically using the e-Qual system. Instead of between two and three percent, the percentage of signatures collected using e-Qual would jump to around fifty percent. The legislature has already found that initiatives, referenda and recalls are more susceptible to fraud, and the eQual system clearly is. There is no time for the Court to order or receive a robust security valuation – and frankly there is no need for one anyway, since the problem with the current system is so obvious (and shocking). Even if Secretary Hobbs and/or her office represent that they do not believe that this is a problem, the simple straight facts above beggar a different conclusion. Finally, the fact that the Office of the Secretary of State has not implemented e-Qual even for local candidates, as it was statutorily required to do, raises serious questions about its ability to actually do so here for propositions, even if it were appropriate to do so.

### III.     Plaintiffs Fail to Show an Unconstitutional Burden

The Plaintiffs—who have been described by media as "left-leaning" groups seeking to promote initiative(s) to increase public funding for candidates for office[2]—cannot demonstrate that the statutory protections against voter fraud found in A.R.S. § 19-112(A), *inter alia* constitute an unconstitutional burden on free speech, in light of the COVID-19 virus and the Governor's Executive Order(s). First, the Governor's "Stay home, Stay healthy, Stay connected" order (Executive Order 2020-18), which provided that "all individuals in the State of Arizona shall limit their time away from their place of residence or property," specifically exempts

---

[2] *See e.g.* Laurie Roberts, " 'Fair elections' group risks looking like a flaming pile of hypocrisy":
 https://www.azcentral.com/story/opinion/op-ed/laurieroberts/2019/11/04/arizonans-fair-elections-wants-use-unfair-election-tactics/4125405002/

"conduct[ing] or participat[ing] in Essential Activities" including "[e]ngaging in constitutionally protected activities such as speech and religion, and any legal or court process provided that such is conducted in a manner that provides appropriate physical distancing to the extent feasible." *See* Sections 2(a), 4(e) of Executive Order 2020-18.[3] Therefore, the Executive Order strictly does not affect the collection of signatures, which Plaintiffs agree is generally a constitutionally protected activity and an exercise in free speech. Second, as the Executive Order notes, the Center for Disease Control has recommended that people "maintain physical distancing of at least six feet from any other person." *Id.*, at Section 5. Although Plaintiffs recite in their Motion a number of statutes and restrictions for collecting initiative signatures, the basic restriction that they appear to be complaining about (or at least, that they could genuinely complain about) is the requirement in A.R.S. § 19-112(A) that "[e]very qualified elector signing a petition shall do so in the presence of the person who is circulating the petition and who is to execute the affidavit of verification." However, qualified electors can still sign an initiative petition "in the presence" of a circulator, and while maintaining a distance of six feet. For example, a person standing at a kiosk can leave their clipboard on a table six feet away, and ask people to sign from a distance. The pen being used can be sanitized. Precautions like this are being taken in every other sector of society, and initiative circulators can certainly cope as well.

The statutory requirement, as Plaintiffs correctly point out, is designed to prevent fraud. While the legislature has specifically authorized candidates for office to collect signatures online (including statewide offices, 16-316; municipal offices, 16-317; and federal offices, 16-318), it has not authorized the proponents of initiatives, referenda, and recall petitions to do so. Following the doctrine of *expressio unius*, it must be assumed that this choice was deliberate, and that the legislature has attributed to initiatives, referenda, and recall petitions—which are often advanced by opaque groups like the Plaintiffs—a greater risk of fraud than candidate

---

[3] Which can be accessed at: https://azgovernor.gov/sites/default/files/eo_2020-18_stay_home_stay_healthy_stay_connected_1.0.pdf

petitions, for which a clearly-identified natural person is ultimately responsible. Further, the standard of review for challenges to candidate petitions is "substantial compliance,"[4] whereas the legislature has specifically provided for a "strict compliance" review for initiatives, referenda, and recall petitions. *See* A.R.S. § 19-102.01 ("Constitutional and statutory requirements for statewide initiative measures must be strictly construed and persons using the initiative process must strictly comply with those constitutional and statutory requirements"); *see also* § 19-201.01 (providing for strict review of recall petitions); § 19-101.01 (referenda). This again sends a clear signal that the legislature has determined a need for stronger qualifying requirements for initiatives, referenda and recall petitions, than for candidates. Given that half of the States in the United States do not even allow for initiatives,[5] it is certainly within the province of the State of Arizona to create and define its own level of comfort with how initiatives are conducted and qualified, and how much security is needed in order to prevent fraud. The State's interest in preventing fraud is high, and the actual burden placed on circulators is comparatively low. While circulators may complain of people not being willing or interested in signing petitions, this burden is strictly not caused by any State regulation or statute, but rather by the virus (or fear of the virus) itself.

It is more than reasonable for the State to require basic protections against fraud, including that a natural person verify that the voter actually signed the petition; and the national recommendations and precautions to prevent the spread of disease by staying six feet away from

---

[4] *See e.g. Bee v. Day*, 218 Ariz. 505, 506, 189 P.3d 1078, 1080 (2008)(discussing "substantial compliance" caselaw with respect to candidate petitions); *Marsh v. Haws*, 111 Ariz. 139, 140, 526 P.2d 161, 162 (1974)(in which the Arizona Supreme Court applied "substantial compliance" to a candidate petition, even though no statute expressly stated that substantial compliance would suffice).

[5] For a list of the twenty-five (25) states that do allow some form of initiative, see https://www.ncsl.org/research/elections-and-campaigns/chart-of-the-initiative-states.aspx

1    other people, which every other sector of society has coped with, does not place such a special

2    burden on circulators that it implicates federal constitutional concerns.

3    **IV.    "Mandatory" Injunctions are Disfavored; "*Pullman*" Abstention Applies**

4         In general, the Plaintiffs' request to have a federal judge direct Secretary Hobbs on how

5    to allocate her office's resources, and to instruct her on what systems to make available and to

6    whom (in contravention of state law), is in the nature of a mandatory injunction, which is

7    "particularly disfavored." *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015). A request

8    for the Court to order a party to take affirmative action is treated as a "mandatory injunction."

9    *Id.* A "mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite*

10   [and] is particularly disfavored." *Id.* "The "district court should deny such relief 'unless the facts

11   and law clearly favor the moving party. In plain terms, mandatory injunctions should not issue

12   in 'doubtful cases.'" *Id.* (internal citations omitted). The Plaintiffs' request also raises issues

13   with respect to the separation of powers,[6] not to mention federal abstention from state affairs,

14   given the state constitutional and legislative policies at issue here. There is also a case that is

15   currently pending in front of the Arizona Supreme Court requesting the same relief, "*Arizonans*

16   *for Second Chances et. al. v. Hobbs*," case no. CV-20-0098-SA.[7] In that case, as here, the

17   Plaintiffs ask the Arizona Supreme Court to "(1) order[] the Secretary to allow them to collect

18   initiative petition signatures for their respective already-filed measures through E-Qual, and (2)

19   enjoin[] the Secretary from enforcing any provision of Arizona law that would preclude the

20   Initiative Proponents' use of E-Qual."[8] The Plaintiffs in that case cite the same federal authority

21   _____

22   [6] "The province of the court is, solely, to decide on the rights of individuals, not to enquire how
     the executive, or executive officers, perform duties in which they have a discretion. Questions,
23   in their nature political, or which are, by the constitution and laws, submitted to the executive,
     can never be made in this court." *Marbury v. Madison*, 5 U.S. 137, 170, 2 L. Ed. 60 (1803).
24

25   [7] The current docket in that matter can be viewed at:
     https://apps.supremecourt.az.gov/aacc/appella/ASC/CV/CV200098.PDF
26
     [8] See page 34 of the Special Action petition is attached as Exhibit "A" hereto.

cited to this Court, including *Burdick v. Takushi*, 504 U.S. 428 (1992) and *Democratic Nat'l Comm. v. Bostelmann* (which was recently overruled by the United States Supreme Court, see at bottom), as well as Arizona constitutional provisions on initiatives (article IV, part 1, section 1(2) of the Arizona constitution) and other related state authorities. The deadline for briefs in that case has already been set for later this month (with the final deadline for all briefs, including amicus briefs and responses thereto, on April 27, 2020). Under the "*Pullman*" abstention doctrine, this Court should abstain from the exercise of federal jurisdiction when "a federal constitutional issue…might be mooted or presented in a different posture by a state court determination of pertinent state law." *C-Y Dev. Co. v. City of Redlands*, 703 F.2d 375, 377 (9th Cir. 1983). "Policies justifying abstention include the desirability of avoiding unseemly conflict between two sovereignties, the unnecessary impairment of state functions, and the premature determination of constitutional questions. Central to all of these concerns are principles of comity and federalism." *Id.* (internal quotation marks and citations omitted). The exercise of *Pullman* abstention is discretionary with the Court, so long as "traditional abstention requirements" are met. *Id.* Here, the Arizona Supreme Court's determination regarding Arizona statutory and constitutional rights and restrictions has the potential to moot out or change the posture of the questions before this Court. Specifically, the Plaintiffs in the Arizona Supreme Court matter ask that court to make determinations about the countervailing state interests and state law policies, especially with respect to the state constitutional and statutory provisions on initiatives, that could affect or even moot out a ruling of this Court. After all, the right to file an initiative petition is one granted only by the state constitution and statutes, and half of states in the United States do not even provide for it—casting further doubt on the federal constitutional magnitude of the relief that Plaintiffs request here.

## V.   Plaintiffs' authority was recently overruled, in a relevant decision

Finally, the Court should be mindful that one of the cases that Plaintiffs cite to at page 10 of their brief in support of their Motion, *Democratic Nat'l Comm. v. Bostelmann*, was overruled

by the United States Supreme Court on Monday. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, 2020 WL 1672702 (U.S. Apr. 6, 2020). In a *per curiam* decision, the United States Supreme Court cautioned that it "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, No. 19A1016, 2020 WL 1672702, at *1 (U.S. Apr. 6, 2020); *see also Purcell v. Gonzalez*, 549 U.S. 1 (2006); *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 135 S.Ct. 9 (2014). The Supreme Court also criticized the district court's "unusual" orders in that case regarding an election (there, an order that required otherwise invalid, late-cast votes to be counted). The Court criticized the district court for "fundamentally alter[ing] the nature of the election." *Id.*

Here, even though Defendant Secretary of State Hobbs was required to give municipal/county candidates access to the E-Qual system over a year ago, she failed to do so and the deadline for municipal/county candidates to submit their nomination petitions has already passed. It would be unfair for the Court to make a special exemption for these special-interest groups alone, especially when the legislature has clearly expressed a policy favoring online signatures for candidates – which the Secretary of State's office did not allow – and against allowing online signatures for initiatives, which Plaintiffs now ask for. In light of the fact that local candidates for office clearly had to make do without online access, and were able to do so; and (2) the fact that other sectors of society have been able to accommodate the Governor's order and basic health/sanitary protections, including the courts, without implicating extraordinary constitutional concerns, the Plaintiffs' request is unnecessary and on top of that, unfair. The issues that Plaintiffs raise could have been raised well in advance of the current COVID-19 problem, and their request is really a "dark horse" to implement something that these kinds of groups have been requesting for some time, and the Arizona legislature has clearly rejected. Given the very serious fraud risk in widespread use of the e-Qual system, such as it is,

9

and the Court's inability to hear or properly address these issues before the election, among the other reasons given above, the request should be denied.

**RESPECTFULLY SUBMITTED** this 10th day of April, 2020.

**WILENCHIK & BARTNESS, P.C.**

/s/ *John "Jack" D. Wilenchik*
Dennis I. Wilenchik, Esq.
Lee Miller, Esq.
John D. Wilenchik, Esq.
The Wilenchik & Bartness Building
2810 North Third Street
Phoenix, Arizona 85004
admin@wb-law.com
*Attorneys for Amicus Curaie*
*Arizona Republican Party*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2020, I electronically transmitted the foregoing document to the Clerk of the Court through the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF registrants for this matter.

By: /s/Christine M. Ferreira

# EXHIBIT A



# ARIZONA SUPREME COURT

| | | |
|---|---|---|
| ARIZONANS FOR SECOND CHANCES, REHABILITATION, AND PUBLIC SAFETY (SPONSORED BY ASJ ACTION FUND); SMART AND SAFE ARIZONA; INVEST IN EDUCATION (SPONSORED BY AEA AND STAND FOR CHILDREN); and SAVE OUR SCHOOLS ARIZONA, | ) ) ) ) ) ) ) ) ) ) ) | No. |
| Petitioners/Plaintiffs, | ) ) | |
| v. | ) ) | |
| KATIE HOBBS, in her official capacity as Arizona Secretary of State, | ) ) ) ) | |
| Respondent/Defendant. | ) ) ) | |

## COMBINED PETITION FOR SPECIAL ACTION AND APPENDIX

Roopali H. Desai (024295)
D. Andrew Gaona (028414)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5478
rdesai@cblawyers.com
agaona@cblawyers.com

*Attorneys for Petitioners/Plaintiffs*

# Table of Contents

Page

Introduction .................................................................................. 1

Jurisdictional Statement ............................................................. 5

Statement of Issues ..................................................................... 7

Statement of Material Facts ....................................................... 7

    A.    The Initiative Process. ............................................. 7

    B.    The Parties. .............................................................. 9

    C.    Traditional Petition Signature Gathering. ........... 11

    D.    The COVID-19 Pandemic. ..................................... 12

    E.    COVID-19 and Traditional Petition Signature
             Gathering. ............................................................... 20

    F.    The E-Qual System. ............................................... 22

Argument ..................................................................................... 23

I.    The Initiative Proponents' Inability to Gather Petition
    Signatures Violates Article IV of the Arizona Constitution .......... 23

II.    Denying the Initiative Proponents Access to E-Qual
    Violates the Arizona Constitution's Guarantees of Equal
    Protection, Due Process, and Free Speech. ................................. 26

    A.    Equal Protection and Due Process ...................... 26

    B.    Free Speech. .......................................................... 28

III.    Denying the Initiative Proponents Access to E-Qual Is a
    Denial of the Right to Vote and Equal Protection Under
    the Fourteenth Amendment. ....................................................... 30

IV.    Denying the Initiative Proponents Access to E-Qual
       Violates Equal Protection and the First Amendment...................33

Conclusion ...............................................................................34

# Table of Citations

**Page(s)**

**Cases**

*Ariz. Indep. Redistricting Comm'n v. Brewer,*
229 Ariz. 347 (2012) ................................................................. 6

*Burdick v. Takushi,*
504 U.S. 428 (1992) ................................................................. 31

*Democratic Nat'l Comm. v. Bostelmann,*
No. 20-CV-249-WMC, 2020 WL 1320819
(W.D. Wis. Mar. 20, 2020) ....................................................... 32

*Direct Sellers Ass'n v. McBrayer,*
109 Ariz. 3 (1972) ........................................................... 3, 25, 27

*Dobson v. State ex rel., Comm'n on Appellate Court
Appointments,*
233 Ariz. 119 (2013) ................................................................. 5

*Duncantell v. City of Houston,*
333 F. Supp. 973 (S.D. Tex. 1971) ......................................... 25

*Fairness & Accountability in Ins. Reform v. Greene,*
180 Ariz. 582 (1994) ................................................................. 6

*Fla. Democratic Party v. Scott,*
215 F. Supp. 3d 1250 (N.D. Fla. 2016) ................................... 32

*Ga. Coal. for the Peoples' Agenda, Inc., v. Deal,*
214 F. Supp. 3d 1344 (S.D. Ga. 2016) .................................... 32

*Governale v. Lieberman,*
226 Ariz. 443 (App. 2011) ....................................................... 27

*In re Holmes,*
788 A.2d 291 (N.J. Sup. Ct. 2002) .......................................... 32

*Idaho Coal. United for Bears v. Cenarrusa,*
  342 F.3d 1073 (9th Cir. 2003) .......................................................... 30

*Kenyon v. Hammer,*
  142 Ariz. 69 (1984) ........................................................................ 27

*League of Ariz. Cities & Towns v. Brewer,*
  213 Ariz. 557 (2006) ........................................................... 25, 27, 34

*Lemons v. Bradbury,*
  538 F.3d 1098 (9th Cir. 2008) .................................................... 30, 31

*Low v. City of Monticello,*
  103 P.3d 130 (Utah 2004) .............................................................. 25

*Martin v. Indus. Comm'n,*
  120 Ariz. 616 (App. 1978) .............................................................. 25

*Meyer v. Grant,*
  486 U.S. 414 (1988) .................................................................. 28, 33

*Miracle v. Hobbs,*
  No. CV-19-04694-PHX-SRB, 2019 WL 7631153
  (D. Ariz. Dec. 16, 2019) ................................................................ 29

*Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n,*
  160 Ariz. 350 (1989) ..................................................................... 29

*Pedersen v. Bennett,*
  230 Ariz. 556 (2012) ..................................................................... 24

*Randolph v. Groscost,*
  195 Ariz. 423 (1999) ....................................................................... 6

*Reed v. Town of Gilbert,*
  135 S. Ct. 2218 (2015) .............................................................. 29, 34

*State v. Stummer,*
  219 Ariz. 137 (2008) ..................................................................... 28

*Turley v. Bolin,*
  27 Ariz. App. 345 (1976) ............................................................... 25

*Whitman v. Moore*,
   59 Ariz. 211 (1942) ........................................................................ 24, 34

*Wilhelm v. Brewer*,
   219 Ariz. 45 (2008) .............................................................................. 34

## Statutes and Rules

42 U.S.C. § 1983 .................................................................................. 30, 33

A.R.S. § 16-316 ............................................................................ 4, 11, 22

A.R.S. § 16-318 ............................................................................ 4, 11, 22

A.R.S. § 19-101 ........................................................................................ 8

A.R.S. § 19-102 ........................................................................................ 8

A.R.S. § 19-111(A) .................................................................................. 7

A.R.S. § 19-111(B) .................................................................................. 7

A.R.S. § 19-112 ........................................................................................ 8

A.R.S. § 19-112(D) .................................................................................. 8

A.R.S. § 19-121 ........................................................................................ 8

A.R.S. § 26-317 ...................................................................................... 19

Ariz. R. P. Spec. Action Rule 2(a)(1) .................................................... 11

Ariz. R. P. Spec. Action Rule 7(b) ........................................................... 6

## Constitutional Provisions

ARIZ. CONST., art. II, § 4 ....................................................................... 27

ARIZ. CONST. art. II, § 6 ........................................................................ 28

ARIZ. CONST., art. II, § 13 ..................................................................... 27

ARIZ. CONST. art. IV .......................................................... 24, 25, 26, 35

ARIZ. CONST. art. IV, pt. 1, § 1(2) ......................................................... 3, 24

ARIZ. CONST. art. IV, pt. 1, § 1(4) ........................................................... 8

ARIZ. CONST. art. IV, pt. 1, § 1(16) ........................................................ 25

ARIZ. CONST. art. VI, § 5(1) ..................................................................... 5

## Other Authorities

Ariz. Att'y Gen. Op. I20-006, *available at*
https://www.azag.gov/sites/default/files/2020-03/I20-
006.pdf .............................................................................................. 16

Ariz. Dep't of Health Svcs., *Coronavirus Home,*
https://www.azdhs.gov/preparedness/epidemiology-
disease-control/infectious-disease-
epidemiology/index.php#novel-coronavirus-home ............................. 14

Ariz. Governor's Office, *Declaration of Emergency \*COVID-
19\** (Mar. 11, 2020),
https://azgovernor.gov/sites/default/files/declaraton_0.pdf .......... 14, 15

Ariz. Governor's Office, Executive Order 2020-09 (Mar. 19,
2020), https://azgovernor.gov/sites/default/files/eo_2020-
09_0.pdf ............................................................................................ 15

Ariz. Governor's Office, Executive Order 2020-12,
*Prohibiting the Closure of Essential Services,*
https://azgovernor.gov/sites/default/files/eo_2021_0.pdf ................... 16

Ariz. Governor's Office, Executive Order No. 2020-18, *Stay
Home, Stay Healthy, Stay Connected, available at*
https://www.azdhs.gov/documents/preparedness/epidemiol
ogy-disease-control/infectious-disease-epidemiology/novel-
coronavirus/eo-stay-home-stay-healthy-stay-connected.pdf ........ 18, 19

`Ariz. Sec'y of State, *Initiative Referendum and Recall,*
https://azsos.gov/elections/initiative-referendum-and-
recall .................................................................................................. 8

Centers for Disease Control, *Cases in U.S.*,
https://www.cdc.gov/coronavirus/2019-ncov/cases-
updates/cases-in-us.html ................................................................... 14

Centers for Disease Control*, Interim US Guidance for Risk
Assessment and Public Health Management of Persons
with Potential Coronavirus Disease 2019 (COVID-19)
Exposures*: *Geographic Risk and Contacts of Laboratory-
confirmed Cases*, https://www.cdc.gov/coronavirus/2019-
ncov/php/risk-assessment.html ........................................................ 18

City of Tucson, *Proclamation of the Mayor Declaring an
Emergency or Local Emergency* (Mar. 17, 2020),
https://www.tucsonaz.gov/files/PROCLAMATION.pdf ..................... 16

*Governor Ducey, Superintendent Hoffman Announce
Extension of School Closures Through End of School* Year,
*available at*
https://azgovernor.gov/governor/news/2020/03/governor-
ducey-superintendent-hoffman-announce-extension-
school-closures ............................................................................... 16

Nat'l Institutes of Health, *New Coronavirus stable for hours
on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-
events/news-releases/new-coronavirus-stable-hours-
surfaces ........................................................................................... 13

U.S. Census Bureau, *Census Bureau Update on 2020 Census
Field Operations* (Mar. 28, 2020), available at
https://www.census.gov/newsroom/press-
releases/2020/update-on-2020-census-field-
operations.html ................................................................................ 19

White House and Centers for Disease Control, *The
President's Coronavirus Guidelines for America*,
https://www.whitehouse.gov/wp-
content/uploads/2020/03/03.16.20_coronavirus-
guidance_8.5x11_315PM.pdf .......................................................... 17

White House, *Proclamation on Declaring a National
   Emergency Concerning the Novel Coronavirus Disease
   (COVID-19) Outbreak* (Mar. 13, 2020)
   https://www.whitehouse.gov/presidential-
   actions/proclamation-declaring-national-emergency-
   concerning-novel-coronavirus-disease-covid-19-outbreak/ ............... 15

World Health Organization, *Coronavirus*,
   https://www.who.int/health-topics/coronavirus .................................. 13

World Health Organization, *WHO Director-General's opening
   remarks at the media briefing on COVID-19 - 11 March
   2020*, https://www.who.int/dg/speeches/detail/who-
   director-general-s-opening-remarks-at-the-media-briefing-
   on-covid-19---11-march-2020 ........................................................... 13

## Introduction

**¶1**     These are truly extraordinary times.

**¶2**     Just three weeks ago, life in Arizona was normal. Our children were in school, people were gathering at sporting events, festivals, restaurants, and shopping malls, and our small businesses were flourishing. And for those Arizonans who had chosen to exercise their longstanding constitutional right to legislate by initiative, it was prime time to participate in democracy; they were outside, conversing with registered voters, and gathering petition signatures. This was precisely the case for Petitioners/Plaintiffs Arizonans for Second Chances, Rehabilitation, and Public Safety (Sponsored by ASJ Action Fund) ("Second Chances"), Smart and Safe Arizona ("Smart and Safe"), Invest in Education (Sponsored by AEA and Stand for Children) ("Invest in Education"), and Save Our Schools Arizona ("SOSAZ"), all political action committees supporting statewide initiative measures (collectively, the "Initiative Proponents"). For them, direct democracy—as envisioned by the framers of the Arizona Constitution—was in full swing.

**¶3**     The Novel Coronavirus 2019 ("COVID-19") pandemic changed, quite literally, everything. To date, there are 186,101 confirmed

cases of COVID-19 in the United States, 1,413 in Arizona. COVID-19 has killed 3,603 Americans, 29 of them fellow Arizonans. President Donald Trump issued a national declaration of emergency, Governor Doug Ducey did the same, and restaurants, bars, and other places where people congregate in most of the state have been closed for weeks. Just yesterday, Governor Ducey's "Stay Home, Stay Healthy, Stay Connected" order went into effect, precluding Arizonans from leaving their homes except for performing certain narrowly-defined "essential" functions. The Centers for Disease Control recommends avoiding "social gatherings in groups of ten or more people," that "older persons" and those with "serious underlying health condition[s]" should "stay home and away from other people," and that all of us practice "social distancing" by maintaining a six foot buffer. The effect of these official proclamations and guidance is stark. Traffic is non-existent, streets are empty, large events are cancelled, and people are staying at home when possible to help mitigate the spread of COVID-19.

¶4      Although this new reality is essential for public health, it is catastrophic to the Initiative Proponents' exercise of their fundamental constitutional right. With only three months left to gather the 237,645

valid petition signatures that each of the Initiative Proponents needs to qualify for the ballot in November 2020, they are left without an effective and safe way to continue their signature gathering efforts. Obtaining petition signatures for an initiative requires personal interaction in close quarters and the exchange of a petition sheet signed by others. And while there are certain precautionary measures that the Initiative Proponents are taking to decrease the risk of COVID-19 transmission in this process, there are no certainties. But more than that, large public events that have historically been the ripest ground for gathering petition signatures will now be non-existent for at least another month, but probably longer. In short, signature gathering will halt, and the Initiative Proponents' hard work and investment is in jeopardy.

¶5      Article IV, part 1, section 1(2) of the Arizona Constitution guarantees Arizonans the right to legislate by initiative, a right understood by this Court and the Legislature to be "fundamental." *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 6 (1972). It follows that the laws enacted by the Legislature to implement this fundamental right cannot work to effectively preclude its meaningful exercise, even amid a national, state, and local emergency. Yet that is the situation in which

the Initiative Proponents find themselves. While they face this impediment to their constitutional right, state and federal candidates can gather nomination petition signatures through a "secure online signature collection" system known as "E-Qual" maintained by the Secretary of State ("Secretary"). *See* A.R.S. §§ 16-316, 16-318; *see also* https://apps.azsos.gov/equal/. Arizonans thus have the right to safely sign candidate petitions from the comfort of their own homes; they do not, however, enjoy that same right for initiative petitions. The Initiative Proponents should have had access to E-Qual from the get-go. But at the very least, current exigencies demand that they <u>now</u> have access to that system starting immediately, and until the deadline to submit initiative petitions and signatures (July 2, 2020).

¶6      For these reasons, the Initiative Proponents ask this Court to exercise its original and special action jurisdiction, and order the Secretary to permit them to gather initiative petition signatures through E-Qual. This result is required by Article IV, principles of equal protection and due process, and the Initiative Proponents' right to free speech. Our democratic institutions, including those of direct democracy, can and should rise up and adapt to meet the challenges we face today as

a society. This Court should thus grant the Initiative Proponents the narrow, expedited relief they seek.

## Jurisdictional Statement

¶7      This Court has original jurisdiction over "mandamus, injunction and other extraordinary writs to state officers." Ariz. Const. art. VI, § 5(1). The circumstances here—involving an unprecedented national public health crisis and the exercise of a fundamental constitutional right—more than justify the Court's exercise of its discretionary jurisdiction to grant the Initiative Proponents the narrow relief they seek.

¶8      This Petition presents an important legal question of first impression: whether the fundamental constitutional rights of the Initiative Proponents are violated by their exclusion from an online petition signature gathering system maintained by the Secretary in the middle of a public health emergency that severely limits (or outright bars) their ability to otherwise collect initiative petition signatures. This is plainly an issue of "substantial public importance" that requires an expedient and final interpretation of the Arizona Constitution. *See, e.g.*, *Dobson v. State ex rel., Comm'n on Appellate Court Appointments*, 233

Ariz. 119, 121 ¶¶ 7-8 (2013) ("Special action jurisdiction is appropriate here because the petition presents purely legal questions of statewide importance that turn on interpreting Arizona's Constitution" and "because the case requires an immediate and final resolution"); *Ariz. Indep. Redistricting Comm'n v. Brewer*, 229 Ariz. 347, 351 ¶ 14 (2012) ("We exercised our discretion to accept special action jurisdiction because the legal issues raised required prompt resolution and are of first impression and statewide importance"); *Randolph v. Groscost*, 195 Ariz. 423, 425 ¶ 6 (1999) (accepting jurisdiction because the "dispute involves a matter of substantial public importance, raises only issues of law, and requires the interpretation of a provision of the Arizona Constitution"); *Fairness & Accountability in Ins. Reform v. Greene*, 180 Ariz. 582, 586 (1994) (accepting jurisdiction because the case raised "a constitutional issue of first impression and statewide importance").

¶9       The Initiative Proponents filed this action directly with this Court, as permitted by Rule 7(b) of the Arizona Rules of Procedure for Special Actions, because an immediate, final decision is needed. Every day that the Initiative Proponents cannot use E-Qual to gather petition signatures is another day their signature collection efforts are effectively

halted, all-the-while the number of days between now and the July 2, 2020 deadline continues to shrink. Only this Court can provide immediate and final relief.

## Statement of Issues

¶10        Arizona, along with the rest of the country, is in the midst of a public health crisis under which it is unsafe and near-impossible for the Initiative Proponents to gather initiative petition signatures in the only meaningful way authorized by existing law:  in person, and primarily in places where large groups of people typically congregate. Candidates, on the other hand, can gather their nomination petition signatures through a secure online system that is unaffected by the ongoing crisis. Does the exclusion of the Initiative Proponents from that system under these circumstances violate their constitutional rights?

## Statement of Material Facts

### A.    The Initiative Process.

¶11        Under Arizona law, the proponent of a statewide initiative measure begins its process by filing with the Secretary an application for petition serial number.  *See* A.R.S. § 19-111(A). The proponent is issued a serial number, *id.* § 19-111(B), and can then begin circulating petitions

bearing that serial number. The form of a petition is carefully prescribed by law; among other things, it must be attached to "a full and correct copy of the title and text of the measure" at all times. *See* A.R.S. §§ 19-101, 19-102, 19-112, 19-121.

¶12     Those petitions are then circulated throughout the State, and a petition circulator must affirm under penalty of perjury that "each individual printed the individual's own name and address and signed th[e] sheet of the foregoing petition in [their] presence on the date indicated." A.R.S. § 19-112(D). Petitions must be filed with the Secretary "not less than four months preceding the date of the election at which the measures so proposed are to be voted upon," ARIZ. CONST. art. IV, pt. 1, § 1(4), and thus to be eligible for the November 2020 ballot, must be submitted on or before July 2, 2020. *See* Ariz. Sec'y of State, *Initiative Referendum and Recall*, https://azsos.gov/elections/initiative-referendum-and-recall. This election cycle, 237,645 valid petition signatures are required to qualify an initiative measure for the ballot. *Id.* Due to lawsuits challenging circulators, petitions, and signatures (which are the norm in Arizona), proponents of statewide initiatives typically try

to collect at least 40% more signatures than the minimum requirement to account for invalid and duplicate signatures.

### B.    The Parties.

¶13     Petitioner/Plaintiff Second Chances is an Arizona political action committee. [APP039] It is the proponent of the Second Chances, Rehabilitation, and Public Safety Act (I-32-2020), a statewide initiative measure filed with the Secretary of State on February 18, 2020 for which it is currently gathering petition signatures. [*Id.*] Second Chances is utilizing primarily paid petition circulators through two separate vendors: AZ Petition Partners, LLC ("Petition Partners") and Arizona Grassroots Advocates ("AGA"). [*Id.*] To date, it has gathered approximately 66,000 total signatures. [*Id.*] Under normal circumstances, Second Chances would be able to collect the requisite number of valid signatures prior to the July 2, 2020 deadline. [APP040]

¶14     Petitioner/Plaintiff Smart and Safe is an Arizona political action committee. [APP039] It is the proponent of the Smart and Safe Arizona Act (I-23-2020), a statewide initiative measure filed with the Secretary of State on September 26, 2019 for which it is currently gathering signatures. [*Id.*] Smart and Safe is utilizing primarily paid

petition circulators through Petition Partners. [*Id.*] To date, it has gathered just under the number of signatures required to qualify. [*Id.*] Under normal circumstances, Smart and Safe would be able to collect the requisite number of valid signatures prior to the July 2, 2020 deadline. [APP040]

¶15     Invest in Education is an Arizona political action committee. [APP039-040] It is the proponent of the Invest in Education Act (I-31-2020), a statewide initiative measure filed with the Secretary of State on February 14, 2020 for which it is currently gathering petition signatures. [APP040] Invest in Education is utilizing a combination of paid petition circulators through Petition Partners and volunteer petition circulators, many of whom are teachers. [*Id.*] To date, it has gathered approximately 85,000 total signatures. [*Id.*]. Under normal circumstances, Invest in Education would be able to collect the requisite number of valid signatures prior to the July 2, 2020 deadline.  [*Id.*]

¶16     SOSAZ is an Arizona political action committee. [APP044] It is the proponent of the Save Our Schools Act (I-33-2020), a statewide initiative measure filed with the Secretary of State on February 26, 2020 for which it is currently gathering petition signatures. [*Id.*] SOSAZ is

attempting to collect petition signature using only volunteer petition circulators, comprised of parents and grandparents, educators, retirees, and other concerned citizens. [*Id.*] To date, it has gathered approximately 50,000 total signatures. [*Id.*]   Under normal circumstances, SOSAZ would be able to collect the requisite number of valid signatures prior to the July 2, 2020 deadline. [APP045]

¶17      Respondent/Defendant Katie Hobbs is the duly elected Secretary of State. In that capacity, she is statutorily responsible for the creation and maintenance of the "E-Qual" secure online signature collection system at the heart of this action. *See* A.R.S. §§ 16-316, 16-318; *see also* https://apps.azsos.gov/equal/. The Secretary is an "officer" for purposes of Rule 2(a)(1) of the Arizona Rules of Procedure for Special Actions.

### C.    Traditional Petition Signature Gathering.

¶18      Petition signature gathering generally occurs through a face-to-face, interpersonal interaction. [APP049; APP055] A petition circulator generally carries a clipboard with the petition (attached to the title and text), approaches a potential signer, and asks if they would be interested in signing. [*Id.*] A dialogue between the parties often follows,

as potential signers often have questions or want to know more about the particular measure. [*Id.*] And if the petition circulator is successful, they ultimately give the petition and a pen to the signer to sign and print all required information. [APP050; APP055-056] Because each petition sheet has fifteen signature lines, each sheet could come into contact with at least sixteen people (*i.e.*, all signers, plus the circulator).

¶19     Petition signatures can be gathered in many different places, but historically, large public gatherings—with a large potentially-captive audience—are the most efficient locations. This includes sporting events, political rallies, school functions, festivals, and cultural events (such as the Arizona State Fair). [APP050] Good petition circulators also identify prime locations in cultural centers to perform their duties. This includes the areas outside of libraries and other public buildings, and street corners in high-traffic areas such as downtown Phoenix, Old Town Scottsdale, and Mill Avenue in Tempe. [APP050-051] Petition circulation can also be accomplished by going door-to-door. [APP056]

### D.   The COVID-19 Pandemic.

¶20     As the World Health Organization explains with respect to coronaviruses and COVID-19 specifically:

> Coronaviruses (CoV) are a large family of viruses that cause illness ranging from the common cold to more severe diseases such as Middle East Respiratory Syndrome (MERS-CoV) and Severe Acute Respiratory Syndrome (SARS-CoV).
>
> Coronavirus disease (COVID-19) is a new strain that was discovered in 2019 and has not been previously identified in humans.
>
> . . . .
>
> Common signs of infection include respiratory symptoms, fever, cough, shortness of breath and breathing difficulties. In more severe cases, infection can cause pneumonia, severe acute respiratory syndrome, kidney failure and even death.
>
> Standard recommendations to prevent infection spread include regular hand washing, covering mouth and nose when coughing and sneezing, thoroughly cooking meat and eggs. Avoid close contact with anyone showing symptoms of respiratory illness such as coughing and sneezing.

World Health Organization, *Coronavirus*, https://www.who.int/health-topics/coronavirus (last visited Apr. 1, 2020). The virus "is stable for several hours to days in aerosols and on surfaces," including for up to twenty-four hours on cardboard. Nat'l Institutes of Health, *New Coronavirus stable for hours on surfaces* (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited Apr. 1, 2020). What began as a small outbreak in Wuhan, China has quickly evolved into a global pandemic. World Health Organization, *WHO Director-General's opening remarks at*

*the   media   briefing   on   COVID-19   -   11   March   2020*,
https://www.who.int/dg/speeches/detail/who-director-general-s-opening-
remarks-at-the-media-briefing-on-covid-19---11-march-2020.

**¶21**     According to the CDC, there are currently 186,101 confirmed
cases of COVID-19 in the United States, and COVID-19 has caused at
least 3,603 deaths. Centers for Disease Control, *Cases in U.S.*,
https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-
us.html (last visited Apr. 1, 2020). According to the Arizona Department
of Health Services ("ADHS"), 1,413 of those cases and 29 of those deaths
are attributable to Arizonans. Ariz. Dep't of Health Svcs., *Coronavirus
Home*,     https://www.azdhs.gov/preparedness/epidemiology-disease-
control/infectious-disease-epidemiology/index.php#novel-coronavirus-
home (last visited Apr. 1, 2020).

**¶22**     On March 11, 2020, Governor Doug Ducey declared a state of
emergency in the State of Arizona due to COVID-19. Ariz. Governor's
Office, *Declaration of Emergency *COVID-19** (Mar. 11, 2020),
https://azgovernor.gov/sites/default/files/declaraton_0.pdf   (last   visited
Apr. 1, 2020). In that declaration, Governor Ducey stated that "COVID-
19 poses a serious public health threat for infectious disease spread to

Arizona residents and visitors if proper precautions recommended by public health are not followed." *Id*. He further stated that there is "reasonable cause to believe the spread of COVID-19 can lead to severe respiratory illness, disease, complications, and death for Arizona residents, particularly those with underlying medical conditions or the elderly." *Id*. Governor Ducey went even further on March 19, 2020 when he issued an executive order closing bars, movie theaters, and on-site dining in restaurants in counties affected by COVID-19. *See* Ariz. Governor's Office, Executive Order 2020-09 (Mar. 19, 2020), https://azgovernor.gov/sites/default/files/eo_2020-09_0.pdf.

¶23    Two days after Governor Ducey first acted, President Donald Trump followed and declared a national emergency related to COVID-19. White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020) https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited Apr. 1, 2020)

¶24    At the local level, cities across the state declared states of emergency, with several also requiring the closure of places where the

public is known to congregate. *See, e.g.*, City of Tucson, *Proclamation of the Mayor Declaring an Emergency or Local Emergency* (Mar. 17, 2020), https://www.tucsonaz.gov/files/PROCLAMATION.pdf. The attorney general recently opined that "local law enforcement officials and county sheriffs have authority to enforce provisions of lawful emergency declarations issued by cities and towns, and violations of such orders are class 1 misdemeanors." Ariz. Att'y Gen. Op. I20-006, *available at* https://www.azag.gov/sites/default/files/2020-03/I20-006.pdf.

¶25     In an attempt to preempt certain emergency actions taken by cities and towns and establish continuity across the state, Governor Ducey issued another executive order on March 23, 2020 to define the categories of "essential services" that could be closed. Ariz. Governor's Office, Executive Order 2020-12, *Prohibiting the Closure of Essential Services*, https://azgovernor.gov/sites/default/files/eo_2021_0.pdf (last visited Apr. 1, 2020) (the "Essential Services Order").

¶26     Other state institutions have been profoundly affected. On March 30, 2020, Governor Ducey and Superintendent of Public Instruction Kathy Hoffman announced the closure of all K-12 schools in the state through the end of this school year. *Governor Ducey,*

*Superintendent Hoffman Announce Extension of School Closures Through End of School* Year, *available at* https://azgovernor.gov/governor/news/2020/03/governor-ducey-superintendent-hoffman-announce-extension-school-closures (last visited Apr. 1, 2020). In addition, this Court has issued two administrative orders related to court operations, and many lower courts have followed with their own orders.

¶27     In the meantime, President Trump—through the CDC—issued "Coronavirus Guidelines for America" as follows:



The White House and Centers for Disease Control, *The President's Coronavirus Guidelines for America*, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Apr. 1, 2020). The CDC further recommends that Americans practice "social distancing" by avoiding

"congregate settings," "mass gatherings," and "maintaining distance (approximately 6 feet or 2 meters) from others when possible." Centers for Disease Control, *Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposures*: *Geographic Risk and Contacts of Laboratory-confirmed Cases*, https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html (last visited Apr. 1, 2020). ADHS is following the guidance provided by the federal government.

¶28      Finally, on March 30, 2020, Governor Ducey issued a new executive order entitled "Stay Home, Stay Healthy, Stay Connected." Ariz. Governor's Office, Executive Order No. 2020-18, *Stay Home, Stay Healthy, Stay Connected*, *available at* https://www.azdhs.gov/documents/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/novel-coronavirus/eo-stay-home-stay-healthy-stay-connected.pdf (last visited Apr. 1, 2020) (the "Stay Home Order"). Effective on March 31 at 5:00 PM, Arizonans are "required to limit their time away from their place of residence or property" except for performing certain "Essential Activities," "Essential Functions," and "Essential Business" as generally set forth in the Essential Services

Order. *Id.* The failure to comply with the Stay Home Order carries with it potential criminal sanctions. *Id.*; *see also* A.R.S. § 26-317 ("Any person who violates any provision of this chapter or who knowingly fails or refuses to obey any lawful order or regulation issued as provided in this chapter shall be guilty of a class 1 misdemeanor."). The Stay Home Order, on its face, excludes "[e]ngaging in constitutionally protected activities such as speech and religion, and any legal or court process provided that such is conducted in a manner that provides appropriate physical distancing to the extent feasible." Stay Home Order, § 4(f). Of course, this exclusion exists within the broader mandate and strong urging of public health officials to stay home and limit contact with others.

¶29    Meanwhile, another large-scale door-to-door operation, the United States Census, has suspended its own field operations due to concerns about COVID-19.  U.S. Census Bureau, *Census Bureau Update on 2020 Census Field Operations* (Mar. 28, 2020), available at https://www.census.gov/newsroom/press-releases/2020/update-on-2020-census-field-operations.html (last visited Apr. 1, 2020). In other words, the situation is so dire that an agency of the federal government has deemed it unsafe to go door-to-door to conduct its critical census work.

### E.   COVID-19 and Traditional Petition Signature Gathering.

¶30     As the COVID-19 pandemic worsened, as Arizonans began following CDC and ADHS guidance, and as cities began requiring the closure of areas where members of the public typically gather, the Initiative Proponents' signature gathering efforts slowed dramatically. [APP040-041; APP045] For weeks, there have been no more large-scale events at which to gather signatures, and the closure of public buildings and bars and restaurants in high-traffic areas means those locations cannot be counted on. [APP040-041; APP045; APP051] And where there are still potential signers out and about (*e.g.*, grocery stores), there are physical distancing protocols in place (such as in lines outside stores) and people are increasingly hesitant to interact despite the use of mitigation measures by petition circulators (including the mandatory use of hand sanitizer, single use pens, and the use of disinfectant on clipboards and other materials). [APP045; APP051]

¶31     In addition, due to the CDC's social distancing recommendations, door-to-door signature collection productivity dropped significantly. [APP056] People were increasingly hesitant to open their

door and interact with strangers [APP056], and rightfully so under these extreme circumstances.

¶32       Despite the Stay Home Order's purported carve-out for "speech," the seriousness it conveys has exponentially exacerbated these problems. To the extent there were few potential petition signers out and about before the Stay Home Order went into effect, those numbers have only further decreased. [APP052-053; APP057] In addition, people are even more leery of opening their doors to strangers. [APP057-58] As one petition circulating firm explains, "[w]hen people open their doors, they overwhelmingly refuse to touch the clipboard, petition sheet, and pens necessary to sign the petition.  Many people have commented to the circulator that he or she should not be going door-to-door and that it is not safe or legal." [*Id.*] Just today, two door-to-door petition circulators were met at two separate doors with threats that the occupants would call law enforcement while citing the Stay Home Order. [APP057-058] This problem is certain to get worse as the Stay Home Order has an increasingly-strong psychological effect on Arizonans. [*See* APP041; APP046]

**F.    The E-Qual System.**

¶33         Under current law, the Secretary is required to "provide a system for qualified electors to sign a nomination . . . by way of a secure internet portal" that "provide[s] a method for the qualified elector's identity to be properly verified." *See* A.R.S. §§ 16-316, 16-318. It is currently available to federal candidates, statewide candidates, and legislative candidates. *Id.* That system is known as "E-Qual," and is available at https://apps.azsos.gov/equal/. It is accessible and easy to use; a potential signer is required to enter their name, date of birth, and either their driver license/non-operating identification number or their voter registration number and the last four numbers of their social security number. https://apps.azsos.gov/apps/election/eps/op/. "Once the voter is verified as a registered voter, E-Qual determines which nomination petitions the voter is eligible to sign . . . based on the voter's registration information. If a voter chooses to sign a nomination petition . . ., the voter's signature that is on file with the statewide voter registration database is affixed to the petition." *Id.* It is efficient for both voters and candidates. At present, however, E-Qual is unavailable to those gathering signatures for initiatives.

¶34      The Initiative Proponents' understanding is that E-Qual can be adapted to be available for their initiative petition signature collection with relative ease. The Initiative Proponents—with this Court's intervention—could successfully transition to an electronic signature gathering effort in the very near future. [APP042; APP047] Making minor adjustments to an existing system to extend it to Initiative Proponents' measures is necessary to protect Arizonans' rights.

## Argument

¶35      This is a case about preserving the people's ability to exercise their fundamental constitutional right to legislate by initiative against the backdrop of an unprecedented public health crisis that effectively prevents them from doing so. That E-Qual is not available to the Initiative Proponents in this time of crisis is simply unconscionable. Fortunately, the remedy is simple, and is justified by both the Arizona Constitution and United States Constitution for the reasons that follow.

## I.   The Initiative Proponents' Inability to Gather Petition Signatures Violates Article IV of the Arizona Constitution.

¶36      *First*, and most fundamentally, the Initiative Proponents' effective inability to gather petition signatures under existing law constitutes a direct violation of the self-executing guarantee of the right

to legislate by initiative set forth in article IV, part 1, section 1(2) of the Arizona Constitution ("Article IV").

¶37     The framers of the Arizona Constitution were strong "advocates of th[e] method of popular government" known as the initiative and referendum, "and the records of the constitutional convention, together with the language of the [] constitution, show clearly that it was the opinion of the delegates who adopted and signed it that its provisions setting forth these principles were among the most important to be found therein." *Whitman v. Moore*, 59 Ariz. 211, 218 (1942). Relevant here, the people's reserved power to legislate by initiative is enshrined in Article IV, and in interpreting that provision, this Court has emphasized that it is "bound to take . . . into consideration" the importance of this power to our framers and the voters who overwhelmingly approved it. *Id.*; *see also Pedersen v. Bennett,* 230 Ariz. 556, 558 ¶ 7 (2012) ("Arizona has a strong policy supporting the people's exercise of this power."). As a consequence, this Court has never hesitated to stress the fundamental nature of this right. *Direct Sellers Ass'n*, 109 Ariz. at 6; *League of Ariz. Cities & Towns v. Brewer*, 213 Ariz. 557, 559 ¶ 9 (2006).

¶38      "A right without a meaningful opportunity to exercise it is really no right at all," *Martin v. Indus. Comm'n*, 120 Ariz. 616, 618 (App. 1978), and the Initiative Proponents presently lack a "meaningful opportunity" to exercise their Article IV rights.[1] And though Article IV is self-executing, *see* ARIZ. CONST. art. IV, pt. 1, § 1(16), the Legislature can enact implementing legislation if: (1) it does not "unreasonably hinder or restrict the constitutional provision," and (2) "reasonably supplement[s] the constitutional purpose." *Turley v. Bolin*, 27 Ariz. App. 345, 348 (1976) (invalidating an attempt by the Legislature to shorten the period for the filing of petition) (citing *Direct Sellers Ass'n*, 103 Ariz. at 5).

¶39      Under present circumstances, requiring that initiative petition signatures be gathered and submitted to the Secretary exclusively on paper, and thus compelling personal interaction that runs afoul of the CDC's "social distancing" guidance, "unreasonably hinder[s] or restrict[s]" Article IV and the Initiative Proponents' rights thereunder.

---

[1]      *Cf. Low v. City of Monticello*, 103 P.3d 130, 132 (Utah 2004) (noting that the constitutional question before the court was whether the city afforded voters "a meaningful opportunity to exercise their constitutional right to a referendum"); *Duncantell v. City of Houston*, 333 F. Supp. 973, 976 (S.D. Tex. 1971) (invalidating burdensome financial requirement for candidates seeking public office, and noting that "[t]he right to vote would be meaningless indeed if there were no candidates to vote for").

It also does not "reasonably supplement" the purpose of Article IV. Under either factor, it is entirely inconsistent with Article IV to require the Initiative Proponents to make the perverse Hobson's Choice between using the only signature-gathering option while running afoul of public health guidance and abandoning their signature-gathering efforts altogether.

¶40    At bottom, denying the Initiative Proponents access to E-Qual under the current state of emergency is a direct violation of Article IV, one that can be remedied by ordering the Secretary to give them access to that system.

## II.    Denying the Initiative Proponents Access to E-Qual Violates the Arizona Constitution's Guarantees of Equal Protection, Due Process, and Free Speech.

¶41    *Second*, the Initiative Proponents' inability to utilize E-Qual also violates the Arizona Constitution's guarantees of equal protection, due process, and free speech. This is another ground on which the Court may grant the Initiative Proponents their requested relief.

### A.    Equal Protection and Due Process.

¶42    The Arizona Constitution guarantees equal protection and due process as follows:  "No law shall be enacted granting to any citizen,

class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations," ARIZ. CONST., art. II, § 13, and "No person shall be deprived of life, liberty, or property without due process of law," ARIZ. CONST., art. II, § 4. "[C]onceptually, the review of due process and equal protection claims is similar." *Governale v. Lieberman*, 226 Ariz. 443, 448 ¶ 13 (App. 2011). If the statute burdens or limits a fundamental right, it "may be upheld only if there is a 'compelling state interest' to be served and the regulation is 'necessary' to achieve the legislative objective." *Kenyon v. Hammer*, 142 Ariz. 69, 78 (1984) (citations omitted). This means that the statute must further the state interest "by the least restrictive means practically available." *Id*. at 87 (citation omitted).

**¶43** The right to legislate by initiative is fundamental under the Arizona Constitution. *See Direct Sellers Ass'n*, 109 Ariz. at 6; *League of Ariz. Cities & Towns*, 213 Ariz. at 559 ¶ 9. The requirement that initiative petition signatures be gathered on paper and in-person when candidates are not so required is thus subject to strict scrutiny. There simply can be no "compelling state interest" in imposing that requirement and shutting

the Initiative Proponents out of E-Qual, especially at this time. That restriction also cannot be narrowly tailored.

¶44     In short, denying the Initiative Proponents access to E-Qual under the current state of emergency violates the equal protection and due process guarantees of the Arizona Constitution.

### B.     Free Speech.

¶45     The Arizona Constitution broadly protects free speech: "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." ARIZ. CONST. art. II, § 6. This provision "has 'greater scope than the first amendment.'" *State v. Stummer,* 219 Ariz. 137, 143 ¶ 17 (2008) (citation omitted). And the right to circulate initiative petitions is one that necessarily involves "core political speech." *Meyer v. Grant,* 486 U.S. 414, 421 (1988).

¶46     Because state law permits statewide and legislative candidates to "speak" in additional ways by seeking petition signatures through E-Qual while denying the Initiative Proponents that same right to "speak" for statewide initiative measures, it imposes a content-based restriction on the Initiative Proponents' speech. "[G]iven Arizona's constitutional protections, when dealing with regulations that affect

speech, the [state] must regulate with narrow specificity so as to affect as little as possible the ability of the sender and receiver to communicate." *Mountain States Tel. & Tel. Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 350, 358 (1989). In addition, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

¶47     As described above (*see* section II.A, *supra*), there is no compelling state interest in denying the Initiative Proponents the opportunity to exercise their free speech rights by collecting petition signatures as statewide, legislative, and federal candidates can: in-person, <u>or</u> via a secure, online system that instantly verifies a signer's identity. *Cf. Miracle v. Hobbs,* No. CV-19-04694-PHX-SRB, 2019 WL 7631153, at *5 (D. Ariz. Dec. 16, 2019) (noting that the distinction "between nomination-petition and initiative-petition circulators" and that "such a distinction might have a chilling effect on the latter category").

¶48      For these reasons, denying the Initiative Proponents access to

E-Qual under the current state of emergency violates their right to free

speech under the Arizona Constitution.

## III.   Denying the Initiative Proponents Access to E-Qual Is a Denial of the Right to Vote and Equal Protection Under the Fourteenth Amendment.

¶49      ***Third***, the Initiative Proponents' inability to utilize E-Qual

also violates both the fundamental right to vote guaranteed by the United

States Constitution, and the Equal Protection Clause of the Fourteenth

Amendment. *See also* 42 U.S.C. § 1983.

¶50      "[S]tate regulations on the initiative and referendum process

implicate the fundamental right to vote," and "[w]hile a state may decline

to grant a right to legislate through ballot initiatives, it may not grant

that right on a discriminatory basis." *Lemons v. Bradbury*, 538 F.3d 1098,

1102 (9th Cir. 2008); *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d

1073, 1077 n.7 (9th Cir. 2003) ("[W]hen a state chooses to grant the right

to vote in a particular form, it subjects itself to the requirements of the

Equal Protection Clause.") The Supreme Court has applied a "flexible

standard" to laws regulating the right to vote:

> A court considering a challenge to a state election law must
> weigh the character and magnitude of the asserted injury to

the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Burdick v. Takushi*, 504 U.S. 428, 432 (1992) (internal quotations and citations omitted). Applying this standard, "strict scrutiny applies only when the right to vote is 'subjected to severe restrictions.'" *Lemons*, 538 F.3d at 1102 (citation omitted). But "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (citation omitted).

¶51    Strict scrutiny should apply to this effective denial of the right to vote. Current exigent circumstances mean that existing law places "severe restrictions" on the Initiative Proponents' rights. Here again, there is no "compelling state interest" that justifies denying them access to E-Qual. Under similar emergency circumstances, courts have not hesitated to enter injunctive relief appropriate to preserve the fundamental right to vote. *See, e.g.*, *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819, at *5-6 (W.D. Wis.

Mar. 20, 2020) (finding that concerns due to COVID-19 justified an extension to an online voter registration deadline); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016) (holding, in the midst of Hurricane Mathew, that "Florida's statutory framework completely disenfranchises thousands of voters, and amounts to a severe burden on the right to vote"); *Ga. Coal. for the Peoples' Agenda, Inc., v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016) (granting preliminary injunction to extend voter-registration deadline due to a hurricane and observing that "an individual's loss of the right to vote is clearly an irreparable injury that outweighs any damage caused by extending the deadline"); *In re Holmes*, 788 A.2d 291 (N.J. Sup. Ct. 2002) (allowing ballots received after election day to be counted due to anthrax attacks because "rigid application of the rule . . . would unfairly deprive absentee voters of their franchise as a result of exceptional circumstances neither within their control nor which, in light of human experience, might reasonably be expected."). This Court should not hesitate to do so here.

¶52     Denying the Initiative Proponents access to E-Qual under the current state of emergency violates their right to vote under the United States Constitution, a violation that can be remedied by narrowly

ordering the Secretary to give them access to that system, albeit limited in duration.

## IV.   Denying the Initiative Proponents Access to E-Qual Violates Equal Protection and the First Amendment.

**¶53**       ***Finally***, the Initiative Proponents' inability to utilize E-Qual also violates the free speech guarantees of the First Amendment, as incorporated against the State by the Fourteenth Amendment.  *See also* 42 U.S.C. § 1983.

**¶54**       The right to circulate initiative petitions is one that necessarily involves "core political speech." *Meyer*, 486 U.S. at 421. For the same reason that existing state law now violates the Arizona Constitution's free speech guarantee (*see* Section II.B, *supra*), so too does it violate the First Amendment. By discriminating between candidates and the Initiative Proponents, it is a content-based restriction on the Initiative Proponents' speech that is "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226. The Secretary cannot carry that heavy burden on these extraordinary facts.

## Conclusion

**¶55**     Decades ago, this Court held that "courts [must] liberally construe initiative requirements and [] not interfere with the people's right to initiate laws unless the Constitution expressly and explicitly makes any departure from initiative filing requirements fatal." *Whitman*, 59 Ariz. at 218. It did so for a compelling reason:

> It is, of course, a mere platitude to say that the people are the superior power in our system of government. The history of our Constitution and its adoption, to which we have previously referred, shows beyond the possibility of contradiction that the people themselves deliberately and intentionally announced that, by its adoption, they meant to exercise their supreme sovereign power directly to a far greater extent than had been done in the past, and that the legislative authority, acting in a representative capacity only, was in all respects intended to be subordinate to direct action by the people.

*Id.* at 220. In other words, the "legislative power of the people is as great as that of the legislature. *League of Ariz. Cities & Towns*, 213 Ariz. at 559 ¶ 9. This Court has long safeguarded this fundamental power from attack. *See, e.g.*, *Wilhelm v. Brewer*, 219 Ariz. 45, 49 ¶ 19 (2008). The time has come for it to do so once again.

**¶56**     Just as all three branches of government must adapt to conduct business during times of national and state crisis, so too must

the procedures that govern the exercise of the fundamental "right of the people to offer legislation through the initiative." And so, to protect their rights under Article IV, the Initiative Proponents respectfully request that this Court accept original and special action jurisdiction and grant them the narrow relief they are requesting by: (1) ordering the Secretary to allow them to collect initiative petition signatures for their respective already-filed measures through E-Qual, and (2) enjoining the Secretary from enforcing any provision of Arizona law that would preclude the Initiative Proponents' use of E-Qual. Arizona's founding principles demand no less.

RESPECTFULLY SUBMITTED this 1st day April, 2020.

COPPERSMITH BROCKELMAN PLC

By /s/ Roopali H. Desai
    Roopali H. Desai
    D. Andrew Gaona

*Attorneys for Petitioners/Plaintiffs*

## TABLE OF CONTENTS

| Description | Page Nos. |
|---|---|
| Declaration of Stacy Pearson | APP037–APP042 |
| Declaration of Catherine Sigmon | APP043–APP047 |
| Declaration of Andrew Chavez | APP048–APP053 |
| Declaration of Jon Seaton | APP054–APP058 |

# ARIZONA SUPREME COURT

| | |
|---|---|
| ARIZONANS FOR SECOND CHANCES, REHABILITATION, AND PUBLIC SAFETY (SPONSORED BY ASJ ACTION FUND); SMART AND SAFE ARIZONA; INVEST IN EDUCATION (SPONSORED BY AEA AND STAND FOR CHILDREN); and SAVE OUR SCHOOLS ARIZONA, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) No.<br>)<br>)<br>)<br>) |
| Petitioners/Plaintiffs, | )<br>) |
| v. | )<br>) |
| KATIE HOBBS, in her official capacity as Arizona Secretary of State, | )<br>)<br>)<br>) |
| Respondent/Defendant. | )<br>)<br>) |

## DECLARATION OF STACY PEARSON

{00491422.1 }

Stacy Pearson states as follows:

1.    I am a Senior Vice President with Strategies 360, Inc. ("S360"). In that role, I provide campaign consulting services to candidates, political action committees, companies, and others throughout the State of Arizona. I have provided these services to clients for more than 20 years.

2.    I currently serve as the General Consultant ("GC") for three political action committees that are seeking petition signatures to qualify statewide measures for the ballot in November 2020: Arizonans for Second Chances, Rehabilitation, and Public Safety (Sponsored by ASJ Action Fund) ("Second Chances"), Smart and Safe Arizona ("Smart and Safe"), and Invest in Education (Sponsored by AEA and Stand for Children) ("Invest in Education"). Collectively, I will refer to all three of these political action committees as the "Committees" in this Declaration.

3.    As the Committees' GC, I am responsible for monitoring and managing all aspects of their petition signature-gathering operations. I am in regular contact with the petition circulating vendors they have hired, and am familiar with all other aspects of their signature-gathering processes. I have personal knowledge about the status and tactics

employed by each of the Committees, as well as the impact that the Novel Coronavirus 2019 ("COVID-19") pandemic has had on their respective signature-gathering efforts.

4.     Second Chances is the proponent of the Second Chances, Rehabilitation, and Public Safety Act (I-32-2020), a statewide initiative measure filed with the Secretary of State on February 18, 2020 for which it is currently gathering petition signatures.  Second Chances is utilizing primarily paid petition circulators through two separate vendors: AZ Petition Partners, LLC ("Petition Partners") and Arizona Grassroots Advocates ("AGA"). To date, it has gathered approximately 66,000 total signatures.

5.     Smart and Safe is the proponent of the Smart and Safe Arizona Act (I-23-2020), a statewide initiative measure filed with the Secretary of State on September 26, 2019 for which it is currently gathering signatures. Smart and Safe is utilizing primarily paid petition circulators through Petition Partners. To date, it has gathered approximately 300,000 total signatures.

6.     Invest in Education is the proponent of the Invest in Education Act (I-31-2020), a statewide initiative measure filed with the

Secretary of State on February 14, 2020 for which it is currently gathering petition signatures. Invest in Education is utilizing a combination of paid petition circulators through Petition Partners and volunteer petition circulators, many of whom are teachers who do so in their spare time. To date, it has gathered approximately 85,000 total signatures.

7.     Before the onset of the COVID-19 pandemic, the Committees were all on track to gather enough petition signatures – including a substantial "buffer" of additional signatures – in advance of the July 2, 2020 deadline to qualify for the November 2020 ballot.

8.     This changed dramatically beginning in the middle of March 2020, when the World Health Organization declared COVID-19 a pandemic, and the federal government, the State, and municipalities in Arizona began to take aggressive measures to prevent its spread.

9.     As Arizonans have begun following guidance put out by the Centers for Disease Control and Arizona Department of Health Services, cities with large populations began requiring the closure of areas where members of the public typically gather, and Governor Doug Ducey issued an executive order requiring the closure of restaurants and other

establishments in counties with a confirmed case of COVID-19, the Committees' petition signature-gathering efforts slowed dramatically.

10. On March 30, 2020, Governor Doug Ducey issued an executive order titled "Stay Home, Stay Healthy, Stay Connected" that requires Arizonans to limit their time outside their homes except for when they are performing certain "essential activities" and "essential functions" until at least April 30, 2020. The issuance of this order was widely covered in local media, where it has been portrayed as a "stay at home" order like those implemented in various other states. The Committees believe that this order will have a strong psychological effect on Arizonans and will further compound the difficulties they were already encountering before it went into effect.

11. The Committees have explored potential alternatives, such as mailing petitions to interested persons to circulate within their families. This, however, is expensive, inefficient, and has no realistic likelihood of permitting the Committees' to gather large numbers of valid petition signatures.

12. In short, due to the COVID-19 pandemic and the various measures taken by the federal, state, and local governments to curb its

spread – measures that discourage the face-to-face interaction required to gather petition signatures under existing Arizona law – there is a serious threat that the Committees will not be able to gather a sufficient number of petition signatures to qualify their respective initiative measures for the ballot in November 2020.

13.    If the Committees can gain access to the Secretary of State's "E-Qual" system for the secure online collection of petition signatures, the Committees are confident that they can launch successful marketing operations to encourage Arizonans to exercise their right to sign an initiative petition safely from their homes while complying with "social distancing" guidance," and without the chance of being exposed to COVID-19.

Pursuant to Rule 80(c), Arizona Rules of Civil Procedure, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this ___1st___ day April, 2020.

Stacy Pearson

# ARIZONA SUPREME COURT

| | | |
|---|---|---|
| ARIZONANS FOR SECOND CHANCES, REHABILITATION, AND PUBLIC SAFETY (SPONSORED BY ASJ ACTION FUND); SMART AND SAFE ARIZONA; INVEST IN EDUCATION (SPONSORED BY AEA AND STAND FOR CHILDREN); and SAVE OUR SCHOOLS ARIZONA, | ) ) ) ) ) ) ) ) ) ) ) | No. |
| Petitioners/Plaintiffs, | ) ) | |
| v. | ) ) | |
| KATIE HOBBS, in her official capacity as Arizona Secretary of State, | ) ) ) ) | |
| Respondent/Defendant. | ) ) ) | |

## DECLARATION OF CATHERINE SIGMON

Catherine Sigmon states as follows:

1.     I am the Treasurer of Save Our Schools Arizona ("SOSAZ"), an Arizona political action committee, and am authorized to provide this Declaration on SOSAZ's behalf.

2.     SOSAZ is the proponent of the Save Our Schools Act (I-33-2020), a statewide initiative measure filed with the Secretary of State on February 26, 2020 for which it is currently gathering petition signatures.

3.     SOSAZ is attempting to collect petition signature using only volunteer petition circulators, comprised of educators, retirees, and other concerned citizens. To date, it has gathered approximately 50,000 total signatures.

4.     SOSAZ has a great deal of experience in gathering petition signatures. In the summer of 2017, it gathered more than 111,000 petition signatures to refer a measure to the ballot. It did by quickly activating and mobilizing a large network of volunteers to gather signatures right as the Arizona summer took hold. This is the network which SOSAZ had just begun to tap into when the World Health Organization declared COVID-19 a pandemic, and the federal

government, the State, and municipalities in Arizona began to take aggressive measures to prevent its spread.

5.     Before the onset of the COVID-19 pandemic, SOSAZ was primed, prepared, and on track to gather enough petition signatures – including a substantial "buffer" of additional signatures – in advance of the July 2, 2020 to qualify for the November 2020 ballot.

6.     As Arizonans have begun following guidance put out by the Centers for Disease Control and Arizona Department of Health Services, cities with large populations began requiring the closure of areas where members of the public typically gather, and Governor Doug Ducey issued an executive order requiring the closure of restaurants and other establishments in counties with a confirmed case of COVID-19, SOSAZ's petition signature-gathering efforts have slowed to a near-halt.  There are no more large-scale events at which to gather signatures, and where there are still potential signers out and about, they are increasingly hesitant to interact despite the use of mitigation measures by petition circulators.

7.     On March 30, 2020, Governor Doug Ducey issued an executive order titled "Stay Home, Stay Healthy, Stay Connected" that requires

Arizonans to limit their time outside their homes except for when they are performing certain "essential activities" and "essential functions" until at least April 30, 2020. The issuance of this order was widely covered in local media, where it has been portrayed as a "stay at home" order like those implemented in various other states. SOSAZ believes that this order will have a strong psychological effect on Arizonans and will further compound the difficulties they were already encountering before it went into effect.

8.     SOSAZ has explored potential alternatives, such as mailing petitions to interested persons to circulate within their families. This, however, is expensive, inefficient, and does not provide SOSAZ with a realistic likelihood of permitting it to gather large numbers of valid petition signatures.

9.     In short, due to the COVID-19 pandemic and the various measures taken by the federal, state, and local governments to curb its spread – measures that discourage the face-to-face interaction required to gather petition signatures under existing Arizona law – there is a serious threat that SOSAZ will not be able to gather enough petition

signatures to qualify its initiative measure for the ballot in November 2020.

10.   If SOSAZ can gain access to the Secretary of State's "E-Qual" system for the secure online collection of petition signatures, SOSAZ is confident that it can launch successful a marketing operation to encourage Arizonans to exercise their right to sign an initiative petition safely from their homes, and without the chance of being exposed to COVID-19.

Pursuant to Rule 80(c), Arizona Rules of Civil Procedure, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 1st day of April, 2020.

Catherine Sigmon

# ARIZONA SUPREME COURT

ARIZONANS FOR SECOND
CHANCES, REHABILITATION,
AND PUBLIC SAFETY
(SPONSORED BY ASJ ACTION
FUND); SMART AND SAFE
ARIZONA; INVEST IN
EDUCATION (SPONSORED BY
AEA AND STAND FOR
CHILDREN); and SAVE OUR
SCHOOLS ARIZONA,

    Petitioners/Plaintiffs,

v.

KATIE HOBBS, in her official
capacity as Arizona Secretary of
State,

    Respondent/Defendant.

No.

---

## DECLARATION OF ANDREW CHAVEZ

---

{00491423.1 }

Andrew Chavez states as follows:

1.    I am the managing member of AZ Petition Partners, LLC ("Petition Partners"). Petition Partners is a full-service petition gathering and consulting firm that has worked on behalf of clients throughout Arizona and the rest of the country for more than 20 years.

2.    In those 20 years, Petition Partners has worked on at least 35 statewide initiative measures, at least 3 statewide referendum measures, at least 40 municipal initiative or referendum measures, and at least 400 statewide, legislative, federal, and local candidates. All told, Petition Partners has gathered more than twelve million petition signatures throughout the country, and more than 8 million in Arizona.

3.    In short, Petition Partners and I have a wealth of experience in petition gathering in Arizona, which is why Petition Partners is by far the most successful petition gathering vendor in Arizona.

4.    Because Arizona law requires that proponents of initiative and referendum measures use paper petitions, effective petition signature gathering occurs through a face-to-face, interpersonal interaction between a petition circulator and potential signer.

5.     A petition circulator generally carries a clipboard with the petition (attached to the title and text of the measure), approaches a potential signer, and asks if they would be interested in signing. A dialogue between the parties often follows, as potential signers often have questions or want to know more about the measure.

6.     If the petition circulator is successful, they ultimately give the petition and a pen to the signer to sign and print all required information. Because each petition sheet has fifteen signature lines, each sheet could come into contact with at least sixteen people (*i.e.*, all signers, plus the circulator).

7.     Petition signatures can be gathered in many different places, but our experience teaches that large public gatherings – with a large potentially-captive audience – are the most efficient locations. This includes sporting events political rallies, school functions, festivals, and cultural events (such as the Arizona State Fair).

8.     In addition, good petition circulators also identify prime locations in cultural centers to perform their duties. This includes the areas outside of libraries and other public buildings, and street corners

in high-traffic areas such as downtown Phoenix, Old Town Scottsdale, and Mill Avenue in Tempe

9.     Petition Partners is currently gathering petition signatures for the Second Chances, Rehabilitation, and Public Safety Act, the Smart and Safe Arizona Act, and the Invest in Education Act (collectively, the "Initiatives").   Before the onset of the COVID-19 pandemic, Petition Partners and its 330 employed petition circulators were using primarily the traditional petition circulating methods outlined above, and were on pace to gather a sufficient number of signatures for each of the Initiatives prior to the July 2, 2020 deadline to submit signatures to the Secretary of State.

10.     As Arizonans have begun following guidance put out by the Centers for Disease Control and Arizona Department of Health Services, cities with large populations began requiring the closure of areas where members of the public typically gather, and Governor Doug Ducey issued an executive order requiring the closure of restaurants and other establishments in counties with a confirmed case of COVID-19, the signature-gathering efforts for the Initiatives slowed considerably.

11.    There are no more large-scale events at which to gather signatures, and the closure of public buildings and bars and restaurants in high-traffic areas means that those locations now cannot be counted on.  And where there are still potential signers out and about, they are increasingly hesitant to interact with petition circulators despite Petition Partners' mandated use of mitigation measures to help prevent the spread of COVID-19 (including the mandatory use of hand sanitizer, single use pens, and the use of disinfectant on clipboards and other materials).

12.    On March 30, 2020, Governor Doug Ducey issued an executive order titled "Stay Home, Stay Healthy, Stay Connected" that requires Arizonans to limit their time outside their homes except for when they are performing certain "essential activities" and "essential functions" until at least April 30, 2020. The issuance of this order was widely covered in local media, where it has been portrayed as a "stay at home" order like those implemented in various other states.

13.    Since this executive order went into effect, Petition Partners has observed another significant drop in the number of petition signatures it is able to gather on behalf of the Initiatives. Reports from

Petition Partners' employees indicate that where potential petition signers are still gathered in any significant number (for example, lines at grocery stores), those people are even less likely than they were before to interact with petition circulators or sign a petition.

14.   This emergency situation is unlike anything I have ever encountered in all my years in the petition-gathering business.

Pursuant to Rule 80(c), Arizona Rules of Civil Procedure, I declare under penalty of perjury that the foregoing is true and correct

EXECUTED this 1st day April, 2020.


_____
Andrew Chavez

# ARIZONA SUPREME COURT

| | |
|---|---|
| ARIZONANS FOR SECOND CHANCES, REHABILITATION, AND PUBLIC SAFETY (SPONSORED BY ASJ ACTION FUND); SMART AND SAFE ARIZONA; INVEST IN EDUCATION (SPONSORED BY AEA AND STAND FOR CHILDREN); and SAVE OUR SCHOOLS ARIZONA, <br><br> Petitioners/Plaintiffs, <br><br> v. <br><br> KATIE HOBBS, in her official capacity as Arizona Secretary of State, <br><br> Respondent/Defendant. | No. |

# DECLARATION OF JON SEATON

Jon Seaton states as follows:

1.    I am a member of Arizona Grassroots Advocates, LLC ("AGA"). AGA is a full service consulting firm that offers petition gathering, canvassing, and other similar services to candidates and committees throughout Arizona.

2.    Because Arizona law requires that proponents of initiative and referendum measures use paper petitions, effective petition signature gathering occurs through a face-to-face, interpersonal interaction between a petition circulator and potential signer. AGA's approach to petition gathering is targeted, and occurs primarily by its petition circulators going door-to-door to select homes in select neighborhoods.

3.    A petition circulator generally carries a clipboard with the petition (attached to the title and text of the measure), approaches a potential signer, and asks if they would be interested in signing. A dialogue between the parties often follows, as potential signers often have questions or want to know more about the measure.

4.    If the petition circulator is successful, they ultimately give the petition and a pen to the signer to sign and print all required information.

- 1 -

Because each petition sheet has fifteen signature lines, each sheet could come into contact with at least sixteen people (*i.e.*, all signers, plus the circulator).

5.     AGA is currently gathering petition signatures for the Second Chances, Rehabilitation, and Public Safety Act (collectively, the "Act"). Before the onset of the COVID-19 pandemic, AGA and its 156 employed petition circulators were using primarily the door-to-door method described above, and were on pace to meet its obligations and help the Act gather a sufficient number of signatures prior to the July 2, 2020 deadline to submit signatures to the Secretary of State.

6.     As Arizonans have begun following guidance put out by the Centers for Disease Control and Arizona Department of Health Services, AGA's signature-gathering efforts for the Act slowed considerably.

7.     Specifically, AGA's petition circulators continued going door-to-door, but people were less and less willing to open their doors to a stranger.

8.     AGA began instituting mitigation measures to try and ease potential petition signers' fears, including appropriate social distancing for all conversations. AGA's circulators have also worn gloves and have

offered signers the opportunity to use their own pens. Circulators have also carried hand sanitizer with them so signers could clean their hands after signing.

9.     On March 30, 2020, Governor Doug Ducey issued an executive order titled "Stay Home, Stay Healthy, Stay Connected" that requires Arizonans to limit their time outside their homes except for when they are performing certain "essential activities" and "essential functions" until at least April 30, 2020. The issuance of this order was widely covered in local media, where it has been portrayed as a "stay at home" order like those implemented in various other states.

10.     Since this executive order was announced and went into effect, AGA has observed another significant drop in the number of petition signatures it is able to gather for the Act. Reports from AGA's employees indicate that people are now even less likely to open their doors.  When people open their doors, they overwhelmingly refuse to touch the clipboard, petition sheet, and pens necessary to sign the petition.  Many people have commented to the circulator that he or she should not be going door-to-door and that it is not safe or legal. On Wednesday, April 1, we began experiencing yet a new difficulty with

signature collection: We had at least two instances in which homeowners threatened to call the police when our circulators went to their doors because they believed our petition circulators were in violation of the Governor's order.

11.   In short, the COVID-19 pandemic and the measures taken by the federal, state, and local governments to limit its spread have made AGA's job of gathering petition signatures for the Act much more difficult.

Pursuant to Rule 80(c), Arizona Rules of Civil Procedure, I declare under penalty of perjury that the foregoing is true and correct.

12.     EXECUTED this 1st day April, 2020.

Jon Seaton

- 4 -