**MARK BRNOVICH**
**ATTORNEY GENERAL**
Drew C. Ensign (No. 25463)
  *Deputy Solicitor General*
Robert J. Makar (No. 33579)
Jennifer J. Wright (No. 27145)
  *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for Intervenor-*
*Defendant State of Arizona*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizonans for Fair Elections, et al.,<br><br>             Plaintiffs,<br><br>vs.<br><br>Katie Hobbs, et al.,<br><br>             Defendants,<br><br>             and<br><br>State of Arizona,<br><br>             Intervenor-Defendant. | Case No: 2:20-cv-00658-DWL<br><br>**STATE OF ARIZONA'S CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (DOC. 2)** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ...................................................................................................... 1

LEGAL STANDARD .................................................................................................. 3

ARGUMENT .............................................................................................................. 3

I.   PLAINTIFFS LACK ARTICLE III STANDING ................................................... 3

II.   PLAINTIFFS' CLAIMS LACK MERIT ........................................................ 4

    A.   The *Anderson-Burdick* Framework Governs Plaintiffs' Claims ....................... 4

    B.   The Challenged Acts Do Not Impose A "Severe Burden" ............................... 5

    C.   The Acts Survive "Less Exacting" Review....................................................... 9

    D.   The First And Fourteenth Amendments Are Not A Source of Positive Rights 10

    E.   Plaintiffs' Case Law Is Inapposite ................................................................. 11

    F.   Accepting Plaintiffs' Arguments Would Have Grave Consequences ............. 13

III. PLAINTIFFS HAVE NOT SATISFIED THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ...................................................................................... 14

    A.   Plaintiffs Have Not Demonstrated That They Are Likely To Suffer Irreparable Harm ........................................................................................................... 14

    B.   The Balance Of Equitites Disfavors Plaintiffs' Request................................. 15

IV. PLAINTIFFS' REQUESTED RELIEF IS UNWARRANTED ............................ 16

CONCLUSION ......................................................................................................... 16

1

## TABLE OF AUTHORITIES

2

**CASES**                                                                                       **PAGE**

3    *Anderson v. United States,*
          612 F.2d 1112, 1115 (9th Cir. 1979) ................................................................ 16
4    *Angle v. Miller,*
          673 F.3d 1122 (9th Cir. 2012) .............................................. 2, 5, 7, 10, 12
5    *Chamness v. Bowen,*
          722 F.3d 1110 (9th Cir. 2013) ...................................................................... 8
6    *Coalition for Economic Equity v. Wilson,*
          122 F.3d 718 (9th Cir. 1997) ........................................................................ 15
7    *DNC v. Bostelmann,*
          No. 20-CV-249-WMC, 2020 WL 1320819 (W.D. Wis. Mar. 20, 2020) ................... 12
8    *Florida Democratic Party v. Scott,*
          215 F. Supp. 3d 1250 (N.D. Fla. 2016) ........................................................ 12
9    *Jackson v. City of Joliet,*
          715 F.2d 1200 (7th Cir. 1983) ...................................................................... 11
10   *Maryland v. King,*
          133 S. Ct. 1 (2012) ...................................................................................... 15
11   *Meyer v. Grant,*
          486 U.S. 414 (1988) ...................................................................................... 8
12   *Nader v. Brewer,*
          531 F.3d 1028 (9th Cir. 2008) ................................................................ 4, 7
13   *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n,*
          457 F.3d 941 (9th Cir. 2006) ........................................................................ 3
14   *Omari Faulkner et al. v. Virginia Dep't of Elections,*
          CL-2000-1456-00 (Va. Cir. Ct. March 25, 2020) .......................................... 12
15   *Orantes-Hernandez v. Thornburgh,*
          919 F.2d 549 (9th Cir. 1990) ...................................................................... 16
16   *Prete v. Bradbury,*
          438 F.3d 949 (9th Cir. 2006) ..................................................... 1, 4, 5, 6, 9
17   *Purcell v. Gonzalez,*
          549 U.S. 1 (2006) ................................................................................ 9, 15
18   *Randall v. Sorrell,*
          548 U.S. 230 (2006) .................................................................................... 13
19   *Regan v. Taxation With Representation of Wash.,*
          461 U.S. 540 (1983) .................................................................................... 11
20   *RNC v. DNC,*
          __ U.S. __, 2020 WL 1672702 (U.S. Apr. 6, 2020) ....................... 12, 13, 15

**CASES (cont.)**                                                                    **PAGE**

*Soltysik v. Padilla*,
   910 F.3d 438 (9th Cir. 2018)............................................................................. 4

*Stanwitz v. Reagan*,
   429 P.3d 1138 (Ariz. 2018).............................................................................. 9

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009).................................................................................... 1, 3

*Timmons v. Twin Cities Area New Party*,
   520 U.S. 351 (1997)......................................................................................... 4

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982)....................................................................................... 15

*Winter v. NRDC*,
   555 U.S. 7 (2008)..................................................................................3, 4, 14

*Zamani v. Carnes*,
   491 F.3d 990 (9th Cir. 2007)........................................................................... 4

**STATUTES**

A.R.S. § 19-112...........................................................................................9, 10

A.R.S. § 19-118................................................................................................... 9

A.R.S. § 19-119.01............................................................................................. 9

A.R.S. § 19-121................................................................................................... 5

A.R.S. § 19-121.02............................................................................................. 9

**CONSTITUTIONAL PROVISIONS**

Ariz. Const. art. IV, Pt. 1, § 1(6)(C)................................................................ 10

Ariz. Const. art. IV, Pt. 1, § 1(9)...........................................................1, 3, 10

**OTHER AUTHORITIES**

2017 Ariz. Sess. Laws, ch. 151 § 3 ................................................................. 10

1

**INTRODUCTION**

2      Plaintiffs' desire for relief from the coronavirus epidemic afflicting our nation is

3   understandable.  Hundreds of millions of Americans are struggling to perform tasks and

4   exercise rights that have suddenly become substantially harder.  But Plaintiffs' Complaint

5   and request for preliminary injunctive relief are badly miscast and fail to establish any

6   basis for relief.  This Court should therefore deny the request for a preliminary injunction.

7      As an initial matter, Plaintiffs lack standing.  Plaintiffs ask this Court only to

8   enjoin "measures under Title 19, Chapter 1, of the Arizona Revised Statutes ('A.R.S.'), in

9   so far as they prevent processing signatures in support of initiatives via Arizona's secure

10  online signature gathering system."  Doc. 2 at 3.  But Plaintiffs somehow missed that the

11  Arizona Constitution separately mandates that all petition signatures be "signed in the

12  presence of the affiant [*i.e.*, circulator]."  Ariz. Const. art. IV, Pt. 1, § 1(9).  Thus, even if

13  the Court were to grant Plaintiffs the relief that they seek, Arizona law would still bar use

14  of the E-Qual system for initiative petitions.  As such, Plaintiffs have failed to establish it

15  is "likely that a favorable judicial decision will prevent or redress the [alleged] injury."

16  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

17     Justiciability issues aside, Plaintiffs' claims fail on the merits.  Plaintiffs'

18  submissions do not establish that the challenged Acts impose a "severe burden" under the

19  governing *Anderson-Burdick* framework.  As such, strict scrutiny does not apply and the

20  challenged provisions of Title 19 (the "Acts") are constitutional if they "serve[] an

21  important regulatory interest" and are "reasonably related" to that interest.  *Prete v.*

22  *Bradbury*, 438 F.3d 949, 970-71 (9th Cir. 2006).  Plaintiffs do not even attempt to

23  advance arguments under this "less exacting review" standard.  *Id.* at 961.

24     This omission/waiver results in the lack of a "severe burden" being dispositive

25  here.  And Plaintiffs have failed to establish the lack of such a burden for several reasons.

26  *First*, the pandemic has only affected a small portion—less than 10%—of the roughly 20

27  months of this election cycle available to collect signatures.  That amount is not severe

28  relative to the total available gathering time that Plaintiffs had for the 2020 cycle.

1

*Second*, the Ninth Circuit looks to whether "reasonably diligent" circulators can qualify for the ballot under the law. *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012). Here, at least one initiative campaign has already collected approximately 300,000 signatures— *i.e.*, well in excess of the 237,645 signatures required (assuming a reasonable validity rate)—and thus is likely to qualify for the ballot. Plaintiffs have made no showing that they could not have been as diligent/effective as this campaign. *Third*, Plaintiffs' submissions fail to establish that coronavirus will have a severe impact on their overall efforts. *Fourth*, the Acts are viewpoint-neutral and even-handed: applying to *all* initiatives regardless of their subject matter or position, which militates against finding a severe burden. *Fifth*, the relief that Plaintiffs seek is actually *less* speech—*i.e.*, the elimination of expressive exchanges between circulators and voters during the initiative process. It does not "severely burden" Plaintiffs' First Amendment rights for the State to decline to facilitate *reductions* in expressive exchanges.

Moreover, Plaintiffs' arguments fail because the First and Fourteenth Amendments do not provide positive rights—*i.e.*, they restrict the government from taking certain specified actions, but they do not affirmatively require the government to assist individuals in dealing with the burdens imposed by external circumstances that the government did not create. For example, political candidates cannot demand that the State provide them moneys they otherwise would have fundraised but for coronavirus. The political branches certainly may choose to grant relief to individuals affected—and Arizona and the United States have quite properly chosen to do so in numerous instances. But individuals do not generally have a constitutional right to demand such assistance in addressing the burdens caused by external, non-governmental forces.

Plaintiffs have also failed to establish that the remaining factors favor their request. Plaintiffs notably have not established that they are likely to suffer irreparable harm. Moreover, the balance of equities does not favor Plaintiffs' requested relief.

Finally, Plaintiffs have not established that the remedy that they seek is the appropriate one. Even assuming that they otherwise are entitled to relief, other forms of

relief could be better tailored to their injury and they have not established that the injunction sought should issue here.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," but instead "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22, 24 (2008). "[P]laintiff[s] seeking a preliminary injunction must establish that [(1) they are] likely to succeed on the merits, that [(2) they are] likely to suffer irreparable harm in the absence of preliminary relief, that [(3)] the balance of equities tips in [their] favor, and that [(4)] an injunction is in the public interest." *Id*. at 20.

## ARGUMENT

## I.   PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs' claims fail as a threshold matter because they have not established Article III standing. Specifically, Plaintiffs have not established that it is "likely that a favorable judicial decision will prevent or redress the [alleged] injury." *Summers*, 555 U.S. at 493.

Plaintiffs here seek only to enjoin certain *statutory* provisions of Title 19. Mot. at 3. But even if those provisions are enjoined, the Arizona Constitution still would prohibit use of the E-Qual system for initiative petitions. Specifically, Article IV, Part 1, Section 1 (9) requires that "every sheet of every such petition [*i.e.*, initiative petitions] containing signatures shall be verified by the affidavit of the person who circulated said sheet or petition, setting forth that each of the names on said sheet **was signed in the presence of the affiant**" (emphasis added). Because signatures gathered through E-Qual are not signed in the presence of anyone competent to sign an affidavit—and Plaintiffs do not contemplate that any such affidavit would be provided in any event—it would violate the Arizona Constitution to accept them. Plaintiffs' alleged injury thus simply will not be redressed even if their proposed relief is granted. *See*, *e.g.*, *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 955 (9th Cir. 2006) (holding that Article III

redressability was lacking where a separate "rule would control even if the [challenged] rule was wiped off the books").[1]

## II.  PLAINTIFFS' CLAIMS LACK MERIT

Each of Plaintiffs' two claims fail on the merits.  Plaintiffs are thus not "likely to succeed on the merits."  *Winter*, 555 U.S. at 20.[2]

### A.  The *Anderson-Burdick* Framework Governs Plaintiffs' Claims

The Ninth Circuit has repeatedly held that *all* constitutional challenges to election regulations are governed by "a single analytic framework"—*i.e.*, the *Anderson-Burdick* framework.  *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011).  That includes "First Amendment, Due Process, [and] Equal Protection claims."  *Id.*  All such claims are "folded into the *Anderson/Burdick* inquiry."  *Soltysik v. Padilla*, 910 F.3d 438, 449 n.7 (9th Cir. 2018).  Plaintiffs correctly appear to acknowledge that *Anderson-Burdick* governs both of their claims.  Mot. at 11.

The *Anderson-Burdick* framework recognizes that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."  *Prete*, 438 F.3d at 961 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

Under the *Anderson-Burdick* framework, "an election regulation that imposes a severe burden is subject to strict scrutiny."  *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008).  In contrast, "*Lesser burdens* trigger less exacting review, and a State's

---

[1]  The State anticipates that Plaintiffs will respond to this remarkable oversight by challenging the Arizona Constitution as unconstitutional as well.  Any such attempt would be waived by being raised first in a reply brief.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").  In any event, if Plaintiffs attempt to do so, this Court should provide the State with an opportunity to respond before ruling on the merits (if the Court declines to find waiver).  If a provision of its Constitution is to be invalidated, the State should be given at least one opportunity to respond to Plaintiffs' actual arguments, rather than anticipated ones.

[2]  Based on the arguments presented here, Plaintiffs' claims should be dismissed under Rule 12.  The State intends to file a timely motion to dismiss, if necessary, following this Court's resolution of the motion for a preliminary injunction.

important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Angle*, 673 F.3d at 1132 (quoting *Prete*, 438 F.3d at 961) (cleaned up).  Notably, "voting regulations are rarely subjected to strict scrutiny." *Dudum*, 640 F.3d at 1106.

As explained below, Plaintiffs fail to establish that the Acts impose a "severe burden" on them.  As such, less exacting scrutiny applies—a standard under which Plaintiffs do not even attempt to argue they can prevail.

**B.  The Challenged Acts Do Not Impose A "Severe Burden"**

The Acts that Plaintiffs challenge, even as-applied during this pandemic, do not impose a severe burden for five reasons.

*First*, the epidemic is only likely to affect a small portion of the total election cycle during which Plaintiffs could collect signatures.  The signature gathering period for the 2020 election cycle is about 20 months long.[3]  Plaintiffs' own declarations use the Governor's March 11 emergency declaration as the relevant starting date of consideration/impact.  *See* Doc. 3 at 4, 5 (¶¶21, 29); Doc. 4 at 3-4 (¶¶15, 17, 22).  Assuming that is the proper starting point,[4] the pandemic has impacted only about one month of the 20-month cycle—roughly 5%.  The President's current guidelines restricting interactions presently last only until April 30—roughly another half month, or 7.5% in total.  Nor do Plaintiffs provide evidence to establish the impacted period is likely to last longer than that.  In Plaintiffs' own telling, they merely do "not know if [they] will be able to resume [their] efforts by *April 30*."  Doc. 4 at 4-5 (¶23) (emphasis added); *accord* Doc. 3 at 6 (¶35).

---

[3]  *See* A.R.S. § 19-121(D) ("[I]n no event shall the secretary of state accept an initiative petition that was issued for circulation more than twenty-four months before the general election at which the measure is to be included on the ballot."); *see also* https://apps.arizona.vote/info/IRR/2020-general-election/18/0 (the earliest application for the current cycle was filed November 13, 2018).  The signature gathering period for this cycle is thus from November 3, 2018 (2 years before the November 3, 2020 election) to the July 2, 2020 deadline for submitting initiative petitions.

[4]  Notably, the Governor did not issue any stay-at-home order until March 30.  Doc. 3 at 6 (¶31).

Even assuming that coronavirus has completely shut down signature gathering during the March 11-April 30, 2020 window, that would only represent a single-digit percentage of the total time available to collect signatures for the 2020 election cycle (~7.5%). Furthermore, it would barely exceed 10% if the pandemic continued to shut down circulating efforts for another month after that until May 31 (*i.e.*, ~12.5%). And Plaintiffs do not submit any evidence that it will.

Plaintiffs do not cite any precedent for the proposition that an impact accounting for less than/around 10% total hindrance is a "severe burden." *See Prete*, 438 F.3d at 967 (holding there was no severe burden where "plaintiffs did not prove that [challenged law] *significantly* limits the available pool of people willing to circulate petitions" (emphasis added)); *accord id.* at 953 n.5. Indeed, it stretches the meaning of "severe" past its breaking point to treat it as such.

Notably, Plaintiff Arizonans for Fair Elections did not file an application with the Secretary until October 30, 2019. Doc. 3 at 2 (¶8). In doing so, it wasted *more than half* of the available time in which it could have been gathering signatures. Similarly, it appears likely that Plaintiff Health Care Rising AZ did not file an application with the Secretary until August 20, 2019. Doc. 4 at 2 (¶7).[5] In doing so, it wasted over 9 of the 20 available months.

It was *Plaintiffs' choice*—not the State's—to procrastinate and dither away time that might later become critical. Plaintiffs' delay absolutely dwarfs the time period that COVID-19 is likely to affect their signature gathering efforts. Plaintiffs' situation amply demonstrates the wisdom of the advice given innumerable times by parents everywhere: "Don't wait until the last minute." The First and Fourteenth Amendments do not exist to bail the Plaintiffs out from their lack of diligence. And while it is certainly true that this pandemic is extraordinary, there are innumerable more-common contingencies (*e.g.*, key

---

[5] The Grennan declaration attests that this was done on "August 26, 2020," Doc. 4 at 2 (¶7)—a date that has not occurred—which appears to be a typographical error. Read in context of subsequent events discussed, which occurred in late 2019 (*id.* at 2 (¶9)) it appears likely that the actual date is August 26, 2019.

staff members quitting, uncommonly bad weather, unexpected cost overruns, lack of public/donor interest) that could have occurred that cumulatively could have had a much greater impact on their ability to gather signatures within the short window Plaintiffs allotted themselves.

*Second*, and relatedly, it appears likely that Plaintiffs could have qualified for the ballot had they exerted reasonable diligence.  The Ninth Circuit has explained that the applicable test for considering challenges to initiative regulations is similar to whether "'reasonably diligent' candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so."  *Angle*, 673 F.3d at 1132 (quoting *Nader*, 531 F.3d at 1035).  Here, another initiative campaign (Smart and Safe Arizona)—which has filed a similar suit in the Arizona Supreme Court—has attested that it was "gathered approximately 300,000 signatures" so far.  Makar Decl. Ex. A.  That notably exceeds the 237,645 signatures it needs by more than 25%, and it is thus quite likely to qualify for the 2020 ballot.  That is particularly true as even Plaintiffs appear to contemplate that they will have some post-emergency time to circulate before the July 2, 2020 submission deadline.  Doc. 3 at 6 (¶35); Doc. 4 at 4-5 (¶23).

Notably, the earliest applicants for initiatives in this election cycle applied far earlier on November 13, 2018.[6]  Plaintiffs have not submitted any evidence that, had they been as diligent, they would still be in their current predicament.

*Third*, Plaintiffs' evidentiary submissions fall far short of satisfying their burden under *Winter*, or answering obvious questions they beg.  Plaintiffs, for example, never explain why they could not be using this time to communicate with voters—through phones, emails, social media, etc.—to obtain their interest/commitment to sign, and then arrange for actual execution after the pandemic has receded.  Although Arizona statutory and constitutional law requires in-person execution of the signatures, that hardly means that Plaintiffs cannot be making productive use of this time to try to secure interest/support from voters.

---

[6]  *See* https://apps.arizona.vote/info/IRR/2020-general-election/18/0.

1   Nor do any of the declarants squarely allege that they cannot proceed absent the
2   proposed relief.  None of the Plaintiffs declarants appear to consider genuinely measures
3   such as using single-use signature sheets, social distancing, or scheduling petition signing
4   in advance at prepared and sanitary locations.  Perhaps those measures would be
5   sufficient.  Perhaps not.  But Plaintiffs bear the burden of proof, and their declarations are
6   simply too thin a reed to satisfy it.  Neither do they explain how any remedy other than
7   use of E-Qual would be insufficient. *See infra* Section IV.

8   *Fourth*, the Acts are viewpoint-neutral and even-handed: applying to *all* initiatives
9   regardless of their subject matter or position, which militates against finding a severe
10  burden.  The Ninth Circuit explained in *Chamness v. Bowen* that because the challenged
11  regulation was "viewpoint neutral … [that] support[ed] the conclusion that it imposes
12  only a slight burden on speech."  722 F.3d 1110, 1118 (9th Cir. 2013).  Similarly, the
13  Ninth Circuit has "repeatedly upheld as 'not severe' restrictions that are generally
14  applicable, even-handed, [and] politically neutral."  *Dudum*, 640 F.3d at 1106 (cleaned
15  up).  The Acts are just that: they apply to *all* initiatives, regardless of the subjects they
16  address and no matter which political groups favor or oppose them, or what messages
17  they are trying to convey.

18  *Fifth*, it is notable that the purportedly "severe burden" on Plaintiffs' First
19  Amendment rights is not *any restriction* on speech, but rather the State's refusal to
20  sanction the elimination of expressive activity that would otherwise occur.  Specifically,
21  courts have long recognized that in-person initiative circulation "of necessity involves
22  both the expression of a desire for political change and a discussion of the merits of the
23  proposed change."  *Meyer v. Grant*, 486 U.S. 414, 421 (1988).  But Plaintiffs do not
24  argue that the State is seeking to interfere with that expressive activity; instead, they want
25  the State to eliminate any requirement that it occur, and transform signature gathering to
26  non-expressive exchanges between voters and inanimate objects (*i.e.*, computers).  But it
27  is not a "severe burden" on Plaintiffs' First Amendment rights for the State to decline to

28

facilitate *reductions* in expressive exchanges.  The First Amendment, after all, guarantees freedom *of speech*, not freedom *from speech*.

### C. The Acts Survive "Less Exacting" Review

Because the Acts do not impose a severe burden, they are constitutional if they "serve[] an important regulatory interest" and are "reasonably related" to that interest. *Prete*, 438 F.3d at 970-71.  There is no dispute that the Acts do so under ordinary times: Plaintiffs admit that "When this crisis passes, the State's denial of access to E-Qual no longer needs to be enjoined."  Mot. at 16.  Plaintiffs thus concede the existence of important government interests generally.

In any event, "'A State indisputably has a compelling interest in preserving the integrity of its election process.'" (citation omitted)).  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  To that end, the State has enacted several statutes to serve that compelling interest.  *See, e.g.*, A.R.S. § 19-112 (requiring a witness who affirms through notarized affidavit); -115 (criminalizing intentionally duplicative or forged signatures); -118 (requiring certain circulators to register); -119.01 (criminalizing certain fraudulent acts by circulators); -121.02 (disqualifying signatures, among other reasons, that don't match the signer's voter registration file).  As this Court has recognized, Plaintiffs "seek exceptions to a litany of statutory requirements aimed at ensuring that initiative-petition signatures are legitimate[.]"  Doc. 61 at 5.  Moreover, "The Arizona Supreme Court has stated that the requirements imposed on signature gatherers, in particular, 'represent[] a reasonable means of fostering transparency ... and mitigating the threat of fraud or other wrongdoing infecting the petition process.'"  *Id.* (quoting *Stanwitz v. Reagan*, 429 P.3d 1138, 1144 (Ariz. 2018)).

These comprehensive laws to prevent, detect, and prosecute fraud are largely incompatible with E-Qual.  In addition, use of E-Qual will eliminate handwriting samples to not only compare against the voter registration file, but also to potentially identify the forgers.  Similarly, the absence of an in-person circulator witnessing the electronic signature deprives the State of a witness to possible forgeries.  In fact, under the E-Qual

system, a person could "sign" on behalf of many others as long as they had some minimal pedigree information and the State would have little ability to detect it.

Arizona also has a significant interest in promoting dialogue by requiring proponents of initiatives to individually engage signers and in so doing provide opportunity for meaningful discussion. Arizona thus specifically requires a circulator be present when the petition is signed with a copy of the measure, facilitating active discussion. Ariz. Const. art. IV, Pt. 1, § 1(9); A.R.S. § 19-112(B). Facilitating those exchanges helps to serve the State's "undeniably … important regulatory interest 'in making sure that an initiative has sufficient grass roots support to be placed on the ballot.'" *Angle*, 673 F.3d at 1135 (citation omitted). Signatures that are the product of expressive exchanges between citizens are more likely to ensure meaningful support than a non-expressive exchange of binary bits with a computer. That is particularly true as the internet is notorious for viral and ephemeral campaigns/memes/etc.

Finally, the State has a significant interest in safeguarding the integrity of its initiative process because initiatives, once approved, are extremely difficult to amend or repeal. In 1998, voters approved the Voter Protection Act ("VPA") which amended Arizona's constitution to require three-fourths of both houses of the Arizona Legislature to amend any voter-approved initiative. Ariz. Const. art. IV, Pt. 1, § 1(6)(C). In 2017, the Arizona Legislature found the VPA "impairs the ability of the legislature … to implement changes to or corrective measures for voter-approved initiatives" making the initiative process an "extraordinary power" of which the State has an interest in "safeguarding the integrity and accuracy of the initiative process." 2017 Ariz. Sess. Laws, ch. 151 § 3.

For all of these same reasons, the Acts would survive strict scrutiny, if it applied.

### D. The First And Fourteenth Amendments Are Not A Source Of Positive Rights

Plaintiffs' claims also run afoul of the fundamental nature of the U.S. Constitution, which generally provides for freedom *from* governmental action, not an affirmative

entitlement to governmental assistance in addressing external, non-governmental forces. "[T]he Constitution is a charter of negative rather than positive liberties.... The men who wrote the Bill of Rights were not concerned that government might do too little for the people but that it might do too much to them. The Fourteenth Amendment, adopted in 1868 at the height of laissez-faire thinking, sought to protect Americans from oppression by state government, not to secure them basic governmental services." *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983).

Governments can and should assist citizens in addressing the myriad challenges posed by the coronavirus.  But the First and Fourteenth Amendments do not demand that the State take any particular action to do so.  Indeed, it is well-established that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right[.]"  *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983).  Notably, *Regan* upheld the denial of public subsidies to organizations engaged in lobbying—which unquestionably was protected activity under the First Amendment.  But the federal government had no obligation to expend federal resources to subsidize that activity.

The same result should obtain here.  The First and Fourteenth Amendments do not command the State to expend resources to alleviate the burdens imposed by an external force on Plaintiffs, such as by the State extending E-Qual to permit electronic execution of signatures in contravention of its own constitutional and statutory law.

**E.  Plaintiffs' Case Law Is Inapposite**

Plaintiffs' brief is notable for what it does not cite:  *i.e.*, a single Ninth Circuit *Anderson-Burdick* case.  Indeed, outside of the legal standard for a PI (Mot. at 9), Plaintiffs do not cite *any* Ninth Circuit authority at all.  Plaintiffs have thus failed to make any argument under the standards that the Ninth Circuit has actually set forth for analyzing electoral regulations of initiatives under *Anderson-Burdick*, such as in *Prete* and *Angle*.

Plaintiffs instead rely almost exclusively on non-precedential, out-of-circuit trial court cases.  That reliance is misplaced.

*Florida Democratic Party v. Scott* was an October 10, 2016 order imposing a *single-day* extension of the voter registration deadline, from October 11 to October 12, 2016 due to a hurricane. 215 F. Supp. 3d 1250 (N.D. Fla. 2016). While citizens have a fundamental right to vote on the officials that represent them, there is no requirement that the States make lawmaking-by-initiative available *at all* or ensure that there are measures on every general election ballot.   *Angle*, 673 F.3d at 1127.   Indeed, while state government can easily survive an election cycle with few or no initiatives on the ballot, it will rapidly crumble if no officials are elected and elected offices are vacant.  The *Scott* reasoning is also so expansive as to be unpersuasive/impossible to apply elsewhere.  The *Scott* court remarkably held that Florida's interests were insufficient under *rational basis* review—which is in this context is tantamount to holding they do not exist.  *Id.* at 1257. Plaintiffs do not even attempt to argue as much here.

*DNC v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1320819 (W.D. Wis. Mar. 20, 2020) was a temporary restraining order issued two days after filing of the relevant complaint, and two days prior to the intervention of the defending party that later successfully obtained a stay from the U.S. Supreme Court of a preliminary injunction issued in that case.  *See RNC v. DNC*, __ U.S. __, 2020 WL 1672702 (U.S. Apr. 6, 2020). It too involved the right to vote on candidates, rather than qualify initiatives for a ballot, thus threatening some individuals with a total deprivation of the right to vote an election, rather than partial reduction in the time available to collect signatures.

*Omari Faulkner et al. v. Virginia Dep't of Elections*, CL-2000-1456-00, *3 (Va. Cir. Ct. March 25, 2020) was effectively a default judgment, where the Commonwealth of Virginia declined to oppose the plaintiff, and the court consequently found it had no state interests "to weigh against 'the character and magnitude of the asserted injury to the rights protected'" by the Constitution.  *Id.*

1    There is no precedential decision that has resulted from any of these cases,

2    although the U.S. Supreme Court stayed injunctive relief in the same Wisconsin election

3    as *Bostelmann*.  *See RNC*, 2020 WL 1672702, at *1.

4    **F.  Accepting Plaintiffs' Arguments Would Have Grave Consequences**

5    Accepting Plaintiffs' arguments would also open a veritable Pandora's Box of

6    other potential constitutional challenges. Few, if any, people's lives have been untouched

7    by coronavirus and virtually everyone could point to activities that have been impaired—

8    including the exercise of constitutional rights.  For example, candidates for political

9    office have a right to raise money and U.S. residents have a right to contribute money.

10   *Randall v. Sorrell*, 548 U.S. 230 (2006).  But coronavirus has undoubtedly interfered

11   substantially with fundraising efforts—as would be expected without the ability to hold

12   dinners, meetings, and rallies.[7]  Undoubtedly that burden is in many cases (unlike here)

13   severe.  But that hardly means that political candidates should be able to demand that

14   governments either (1) make up the difference by directly funding their campaigns to

15   make up the shortfalls or (2) must waive or substantially expand contribution limits, so

16   that candidates can raise the money they otherwise would have collected.

17   Similarly, many political groups often rely on meeting, rallies, and pamphleteering

18   to spread their message—which are obviously less effective now.  But that hardly means

19   that they can demand that the government fund alternative speech or allocate channels of

20   governmental speech to alleviate the impacts.  In many cases, they simply will have to

21   live with the inevitable diminution of their expressive capacities as an unavoidable—and

22   non-governmentally-caused—result of the pandemic.

23   In short, hardships abound in this crisis.  But that does not mean that Plaintiffs

24   alone should be excused from generally applicable laws.  And it is doubtful that our

25   system of government can tolerate all of the exceptions that would necessarily be

26

27

28

[7] *See, e.g.,* Severns, Maggie and Arkin, James, Politico, *'It can be catastrophic':
Coronavirus tanks campaign fundraising* (March 20, 2020) *available at*
https://www.politico.com/news/2020/03/20/coronavirus-campaign-fundraising-138381.

1  required if Plaintiffs' arguments were accepted and fairly applied to all others impacted

2  by coronavirus.

3  **III.   PLAINTIFFS   HAVE   NOT   SATISFIED   THE   REMAINING
   REQUIREMENTS FOR INJUNCTIVE RELIEF**

4
   **A. Plaintiffs Have Not Demonstrated That They Are Likely To Suffer
5      Irreparable Harm**

6       Plaintiffs' submissions also fail to establish that they are "*likely* to suffer

7  irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (emphasis

8  added).  Plaintiff Healthcare Rising AZ notably already has 273,786 signatures—*i.e.*,

9  36,141 more signatures than the required number.  Doc. 4 at 3-4 (¶¶ 10, 17).  It thus

10 likely will qualify for the ballot with post-crisis circulation and reasonable diligence.

11 Indeed, it may already have a sufficient number of valid signatures.  And it tellingly

12 offers no details to support their entirely conclusory statement that "it is unreasonable to

13 expect the Committee to meet the statutory signature requirement by July 2, 2020." *Id.* at

14 5 (¶24).

15      In contrast, Plaintiff Arizonans for Fair Elections has collected *far* fewer

16 signatures: only 110,333 as March 11, 2020—only about 40% of the number assuming

17 100% were valid.  Doc. 3 at 5 (¶29).  Given this paltry pre-pandemic showing, there is

18 thus strong reason to doubt that it would have collected the requisite number absent this

19 emergency.  It thus has not likely suffered irreparable harm caused by the challenged

20 Acts, rather than by its own inadequate progress.  Indeed, the committee tellingly does

21 not even *allege* either that (1) it was likely to qualify for the ballot absent the pandemic

22 *or* (2) it is likely to qualify even if the requested injunction issues.

23      As to Plaintiff Turk, she only alleges that she "would like to sign petitions [she is]

24 in favor of in order to bring these initiatives to the ballot, and provide the people of

25 Arizona with an opportunity to voice their vote." Doc. 5 at 2 (¶10).  But she notably does

26 not allege that she will not have an opportunity to do so before the applicable July

27 deadline.  The mere delay in her ability to sign petitions—rather than any actual outright

28

denial for the 2020 election cycle—does not constitute irreparable harm. *Cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982).

Because Plaintiffs have not established that they are *likely* to suffer irreparable harm, their motion should be denied on that basis alone.

## B. The Balance Of Equities Disfavors Plaintiffs' Request

The balance of equities also tips against issuance of a preliminary injunction. "[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coalition for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *accord Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (same). These harms outweigh Plaintiffs' speculative, skeletal and unlikely harms. *See supra* at 14-15.

Moreover, "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4-5. The July 2 deadline for submitting petitions with signatures is now rapidly approaching. And any order granting a preliminary injunction could potentially be appealed and reversed—causing further electoral chaos.

For these reasons, the U.S. Supreme Court recently stayed a coronavirus-based injunction permitting additional time to mail in ballots—which could result in voters outright losing an opportunity to vote. *See RNC*, 2020 WL 1672702, at *1. Here, however, Plaintiffs will lose at most a small portion of the 20 months available to them to collect signatures. The equities thus militate even more against a preliminary injunction here than they did in *RNC v. DNC*.

Plaintiffs' request should further be rejected because it seeks mandatory relief—*i.e.*, compelling the Secretary to enable use of the E-Qual system. Mandatory injunctions like this one "'go[] well beyond simply maintaining the status quo *pendente lite* [and] [are] particularly disfavored.'" *Stanley v. USC*, 13 F.3d 1313, 1320 (9th Cir. 1994) (citation omitted). Plaintiffs seeking this "disfavored" remedy must meet a heightened burden; indeed, district courts must "*deny such relief*, 'unless the facts and law *clearly*

1   *favor* the moving party.'" *Id.* (emphasis added) (citation omitted)); *accord Anderson v.*
2   *United States*, 612 F.2d 1112, 1115 (9th Cir. 1979).  Plaintiffs have made no such legal or
3   factual showing.

4   **IV.     PLAINTIFFS' REQUESTED RELIEF IS UNWARRANTED**

5           Even if Plaintiffs had established their entitlement to some relief—including a
6   likely violation of the U.S. Constitution—their requested injunction is ill-explained and
7   inequitable.  Plaintiffs have not, for example, explained why a pro rata reduction of the
8   signature requirement would not be a more appropriate remedy than use of the E-Qual
9   system.  (For example, if coronavirus renders signature gathering half as effective for two
10  months, a 5 (0.5 * 2 months / 20 months) pro rata reduction could be ordered.)  Similarly,
11  Plaintiffs have not explained why a relaxation of the in-person execution requirement—
12  *e.g.*, to permit "virtual presence" through live audio/video transmission—would not
13  remedy their harm more precisely (and in a more narrowly tailored manner).  *See*, *e.g.*,
14  *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) (Injunctions "must
15  be narrowly tailored to give only the relief to which plaintiffs are entitled.").  Nor have
16  Plaintiffs explained why an injunction simply permitting them to apply signatures they
17  have collected for qualifying for the 2022 election would not be sufficient.  (That
18  obviously would be a delay, but delays abound to millions of Americans for a myriad of
19  tasks they otherwise could accomplish earlier absent this pandemic.)  Such issues should
20  be resolved before any injunction issues.

**CONCLUSION**

22          Plaintiffs' request for a temporary restraining order and preliminary injunction
23  should be denied.

Respectfully submitted this 10th day of April, 2020.

MARK BRNOVICH
ATTORNEY GENERAL

By: s/ Drew C. Ensign
Drew C. Ensign (No. 25463)
  *Deputy Solicitor General*
Robert J. Makar (No. 33579)
Jennifer J. Wright (No. 27145)
  *Assistant Attorneys General*

*Attorneys for Intervenor-
Defendant State of Arizona*

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on this 10th day of April, 2020, I caused the foregoing

3

document to be electronically transmitted to the Clerk's Office using the CM/ECF

4

System for Filing, which will send notice of such filing to all registered CM/ECF users.

5

6

 s/ Drew C. Ensign

7

Drew C. Ensign

8

*Attorneys for Intervenor-*

9

*Defendant State of Arizona*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28