1

**CANTELME & BROWN, P.L.C.**

2

A Professional Liability Company
2020 S. McClintock Drive, Suite 109

3

Tempe, Arizona 85282
Tel (602) 200-0104    Fax (602) 200-0106

4

E-mail:  david@cb-attorneys.com/aaron@cb-
attorneys.com

5

David J. Cantelme, Bar No. 006313
D. Aaron Brown, Bar No. 022133

6

*Attorneys for Intervenor*

7

**UNITED STATES DISTRICT COURT**

8

**DISTRICT OF ARIZONA**

9

10

| | |
|---|---|
| Arizonans for Fair Elections (AZAN), an Arizona nonprofit corporation; *et al*., | Case No. 2:20-cv-00658-DWL |
| Plaintiffs, | **MOTION OF THE SPEAKER OF THE ARIZONA HOUSE OF REPRESENTATIVES AND PRESIDENT OF THE ARIZONA SENATE FOR RECONSIDERATION OF ORDER DENYING LEAVE TO INTERVENE** |
| v. | |
| Katie Hobbs, Arizona Secretary of State; *et al*., all in their official capacities, | |
| Defendants. | |

11

12

13

14

15

16

17

18

19      Pursuant to LRCiv 7.1(g), proposed Intervenor Defendants Speaker of the Arizona

20      House of Representatives and President of the Arizona Senate move for reconsideration

21      of the Court's order (Doc. 61) filed April 10, 2020, denying their motion to intervene in

22      this action as Defendants, primarily on the adequacy-of-representation prong of the

23      intervention test.  Since the Court entered its order denying intervention the Attorney

24      General filed his response (Doc. 74) opposing the TRO and preliminary-injunction

25      motion, the Secretary filed her response (Doc. 78) supporting the motion together with

26      the Dul declaration (Doc. 78-1), and Plaintiffs filed the Gallaway affidavit (Doc. 79)

1   supporting their TRO motion.  The newly-filed responses and affidavit reveal facts

2   warranting the intervention of the Speaker and President that were not evident before the

3   Court made its decision.  Accordingly, the standard for reconsideration set forth in LRCiv

4   7.1(G)(1) is met, and upon reconsideration the Court should grant leave to intervene for

5   at least the following new reasons:

6          1.        Ariz.Const. art. 5, § 1, creates the office of Attorney General, but confers

7   no powers on it.  Ariz.Const. art. 5, § 9, leaves it to the Legislature to determine the

8   office's powers and duties by law.  In A.R.S. § 12-1841, the Legislature conferred no

9   more power on the Attorney General than it did on the Speaker and Senate President to

10  defend the constitutionality of Arizona laws.  Their powers are co-equal in mounting a

11  defense.  In that vein, while the Attorney General filed an excellent response detailing

12  why as a matter of law the Court should deny a temporary restraining order or preliminary

13  injunction on the existing record framed by Plaintiffs' three declarations supporting their

14  motion, he made no request for an evidentiary hearing, which ordinarily is required before

15  a preliminary injunction can issue.[1]  *Charlton v. Estate of Charlton*, 841 F.2d 988, 989

16  (9th Cir. 1988) ("Generally the entry or continuation of an injunction requires a

17  hearing.  Only when the facts are not in dispute, or when the adverse party has waived its

18  right to a hearing, can that significant procedural step be eliminated.") (internal quotation

19  marks omitted.)  In this respect, it would be appropriate to deny relief if, taking all of a

20  plaintiff's factual assertions as true, such allegations still do not make a case for injunctive

21  relief.  The converse, however, is not true.  A defendant should be allowed an evidentiary

22  hearing to cross-examine a plaintiff's affiants, to expose errors in the affidavits, and to

23  refute the affidavits with affirmative evidence to the contrary.  *Id.*  The Gallaway affidavit

24

25  [1] The Attorney General wrote his response before Plaintiffs filed the Gallaway affidavit,
26  and the response could not and did not respond to the points made in it.  This is ample
    reason for postponing the TRO hearing until the affidavit can be responded to.

1  makes the need even more acute for an evidentiary hearing and at least the deposition of

2  Mr. Gallaway.  This is not just a mere difference of opinion as to litigation strategy and

3  tactics.  It is essential to build a record disputing Plaintiffs' points of fact, as well as

4  arguing that the facts taken as true are inadequate to support relief, as the Attorney

5  General in essence did in his opposition to the motion.  Apart from the law, it is essential

6  to construct an evidentiary record in this trial court defeating the factual premises of the

7  motion.  To that end, here are some questions of fact that the Speaker and Senate President

8  would cover on cross-examination and perhaps by affirmative witnesses to the contrary:

9        a)     Why did the two Plaintiff Committees wait so long to start signature

10                gathering?  Both wasted more than half of the allotted 19 months

11                doing nothing.

12        b)     Other states allow initiatives. What have they done to deal with the

13                pandemic?  Do they allow online signatures?  The information we

14                have gathered so far suggests the answer is no.  If so, what makes

15                Arizona unique so that the Court would be justified in ordering a

16                remedy here that no other state provides?

17        c)     Governor Ducey's Executive Order 2020-18 expires on April 30,

18                2020, but currently at subsection 4(g) it specifically classifies

19                constitutionally protected activities as essential activities exempt from

20                the order's stay-home provisions.  Thus, the order does not prevent

21                signature gathering, which the Gallaway affidavit concedes at ¶ 40.

22                Plaintiffs claim the pandemic imposes an unacceptable burden on

23                their signature gathering, but is it true?  To that end, what has been

24                the experience of other states regarding initiative-petition gathering?

25

26

1   d)   After the Governor's executive order expires, what effects, if any, on

2        signature gathering will the pandemic cause?  Will the cost go up, and

3        if so by how much?

4   e)   If signature gathering is cost prohibitive, how do we know that the use

5        of E-Qual solves the problem?  What has been the experience of

6        candidates that used it?  What was their daily yield rate on E-Qual?

7        How does that compare to actual signature gathering?

8   f)   What will it cost an initiative proponent to make use of an E-Qual

9        system to gather signatures for an initiative petition?  The petition

10       proponents must conduct a marketing campaign to make voters aware

11       of the availability of E-Qual, if it is ordered to be provided, and what

12       would it cost to market online signature gathering?  How does that

13       compare to the cost of gathering actual signatures between now and

14       the July 2 filing deadline?

15  g)   How would the E-Qual signatures be checked?  They do not fit the

16       current random-sampling system that Plaintiffs described in the

17       complaint (Doc. 1) at ¶¶ 39-51.  Plaintiffs imply the signatures all

18       would be valid.  How do we know that?

19  h)   Can the system be hacked or cheated?  What security systems does E-

20       Qual have to protect and preserve the integrity of the process?

21

22      2.   The Secretary's response and the Dul declaration make an even more

23  compelling case for intervention by the Speaker and Senate President.  Specifically, they

24  aver that it will take four weeks to build an E-Qual system that can handle initiative

25  petitions, and that they will need 60 employees to administer it and check signatures.  *See*

26  Dul Declaration (Doc. 78-1) at ¶¶ 1-18.  The first and obvious question to be developed

4

1  on cross-examination and with affirmative witnesses is whether these claims are true.  Of

2  equal importance to the intervention issue is the question of what will it cost to build such

3  a system and hire 60 employees the Secretary claims she will need.  This cost creates an

4  even more compelling interest for the Legislature to protect through intervention.  Only

5  the Legislature can appropriate money, and the pandemic will create many more

6  competing expenditure requests to protect the health and safety of our people.  The

7  Supreme Court has cautioned against state agencies gaining a priority to scarce tax dollars

8  by conceding judgment in federal court litigation.  *See Horne v. Flores*, 557 U.S. 433,

9  448 (2009) ("Federalism concerns are heightened when, as in these cases, a federal

10  court decree has the effect of dictating state or local budget priorities. States and local

11  governments have limited funds. When a federal court orders that money be appropriated

12  for one program, the effect is often to take funds away from other important programs.")

13  Because he is not in the appropriations arena having to make ends meet amongst many

14  worthy and competing needs and interests and having to say no to many of our citizens,

15  the Attorney General can never defend the Legislature's power of the purse – maybe its

16  most important power -- as zealously as Legislative Intervenors can and will do in this

17  case.

18      For these reasons, or any of them, the Court should grant reconsideration and allow

19  the Speaker and Senate President to intervene as defendants in this action.

20      RESPECTFULLY SUBMITTED on April 13, 2020.

21                              **CANTELME & BROWN, P.L.C.**

22

23      /s/ David J. Cantelme, Bar No. 006313
        2020 S. McClintock Drive, Suite 109
24      Tempe, Arizona 85282
        Tel (602) 200-0104
25      Fax (602) 200-0106
        david@cb-attorneys.com
26      aaron@cb-attorneys.com

1

**CERTIFICATE OF SERVICE**

2

      I hereby certify that on April 13, 2020, I caused the foregoing document to be

3

electronically transmitted to the Clerk's Office using the CM/ECF System for Filing,

4

which automatically serves notice of such filing electronically to all parties who have

5

appeared and registered CM/ECF users with a hyperlink to retrieve the document.

6

7

/s/       Megan Bilek

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26