Israel G. Torres (#020303)
James E. Barton II (#023888)
Jacqueline Mendez Soto (#022597)
TORRES LAW GROUP, PLLC
2239 West Baseline Road
Tempe, Arizona 85283
(480) 588-6120
James@TheTorresFirm.com
Jacqueline@TheTorresFirm.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizonans for Fair Elections (AZAN), an Arizona nonprofit corporation; Arizonans Fed Up with Failing Healthcare (Healthcare Rising AZ) an Arizona nonprofit corporation; and Randi L. Turk, an individual, | Case No.: 2:20-cv-00658-DWL |
| Plaintiffs, | **NOTICE OF APPEAL** |
| v. | |
| Katie Hobbs, Arizona Secretary of State; Edison Wauneka, Apache County Recorder; David Stevens, Cochise County Recorder; Patty Hansen, Coconino County Recorder; Sadie Jo Bingham, Gila County Recorder; Wendy John, Graham County Recorder; Sharie Miheiro, Greenlee County Recorder; Richard Garcia, La Paz County Recorder; Adrian Fontes, Maricopa County Recorder; Kristi Blair, Mohave County Recorder; Doris Clark, Navajo County Recorder; F. Ann Rodriguez, Pima County Recorder; Virginia Ross, Pinal County Recorder; Suzanne Sainz, Santa Cruz County | |

Recorder; Leslie Hoffman, Yavapai County Recorder; and Robyn Pouquette, Yuma County Recorder; all in their official capacities,

Defendant.

Notice is hereby given that Plaintiffs appeal to the United States Court of Appeals for the Ninth Circuit from this Court's Judgment of Dismissal in a Civil Case and Order dismissing Plaintiffs' Complaint and Request for Injunction and denying their Motion for Temporary Restraining Order and Preliminary Injunction entered in the above-captioned action on April 17, 2020.  The Court's Judgment and Order are attached to this Notice as Exhibits A and B, respectively.

Plaintiffs' Representation Statement, required by Ninth Circuit Rule 3-2(b), is attached to this Notice as Exhibit C.

RESPECTFULLY SUBMITTED this 20th day of April, 2020.

TORRES LAW GROUP, PLLC


/s/James E. Barton II
James E. Barton II
Jacqueline Mendez Soto
*Attorneys for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Roy Herrera
Daniel A. Arellano
Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004
(602) 798-5400
herrerar@ballardspahr.com
arellanod@ballardspahr.com
andrewsj@ballardsparh.com
*Attorneys for Katie Hobbs, Secretary of State*

Joseph Young
Apache County Attorney's Office
Post Office Box 637
St. Johns, Arizona 85936
(928) 337-7560
JYoung@Apachelaw.net
*Attorney for Defendant Edison Wauneka, Apache County Recorder*

Britt W. Hanson
Christine J. Roberts
Cochise County Attorney
Post Office Drawer CA
Bisbee, Arizona 85603
(520) 432-8700
CVAttmeo@cochise.az.gov
Bhanson@cochise.az.gov
*Attorneys for Defendant David Stevens, Cochise County Recorder*

Rose M. Winkeler
Coconino County Attorney
110 East Cherry Avenue
Flagstaff, Arizona 86001
(928) 679-8200
rwinkeler@coconino.az.gov
*Attorney for Defendant Patty Hansen, Coconino County Recorder*

Jeff Dalton
Gila County Attorney's Office
1400 East Ash Street
Globe, Arizona 85501
(928-402-8630
jdalton@gilacountyaz.gov
*Attorney for Sadie Jo Bingham Gila County Defendants*

Kenneth Angle
Graham County Attorney's Office
800 West Main Street
Safford, Arizona 85546
(928) 428-3620
kangle@graham.az.gov
*Attorney for Wendy John, Graham County Recorder*

Jeremy Ford
Greenlee County Attorney's Office
Post Office Box 1717
Clifton, Arizona 85533
(928) 865-2072
jford@co.greenlee.az.us
*Attorney for Sharie Milheiro, Greenlee County Recorder*

Tony Rogers
La Paz County Attorney's Office
1320 Kofa Avenue
Parker Arizona 85344
(928) 669-6118
trogers@lapazcountyaz.org
*Attorney for Defendant Richard Garcia, La Paz County Recorder*

Joseph E. La Rue
Joseph Branco
Maricopa County Attorney's Office
Civil Services Division
222 North Central Avenue, Suite 1100
Phoenix, Arizona 85004
(602) 506-8541
laruej@mcao.maricopa.gov
branco@mcao.maricopa.gov
*Attorneys for Adrian Fontes, Maricopa County Recorder*

Jeffrey B. Haws
Mohave County Attorney's Office
315 North 4th Street
Post Office Box 7000
Kingman, Arizona 86402
(928) 753-0770
Jeff.Haws@mohavecounty.us
*Attorney for Defendant Kristi Blair, Mohave County Recorder*

Brad Carlyon
Jason S. Moore
Navajo County Attorney's Office
Post Office Box 668
Holbrook, AZ 86025
(928) 524-4026
Jason.moore@navajocountyaz.gov
*Attorneys for Doris Clark, Navajo County Recorder*

Daniel Jurkowitz
Pima County Attorney's Office, Civil Division
32 North Stonve Avenue, Suite 2100
Tucson, Arizona 85701
(520) 724-5700
Daniel.jurkowitz@pcao.pima.gov
*Attorney for Defendant F. Ann Rodriguez, Pima County Recorder*

Kent Volkmer
Craig Cameron
Pinal County Attorney
Post Office Box 887
Florence, AZ 85132
(520) 866-6466
Craig.cameron@pinalcountyaz.gov
*Attorneys for Defendant Virginia Ross, Pima County Recorder*

Kimberly Hunley
Santa Cruz County Attorney's Office
2150 North Congress Drive, #201
Nogales, Arizona 85621
(520) 375-7780
khunley@santacruzcountyaz.gov
*Attorney for Defendant Suzanne Sainz, Santa Cruz County Recorder*

3

Thomas M. Stoxen
Yavapai County Attorney's Office
255 East Gurley Street
Prescott, Arizona 86301
(928) 777-7143
Thomas.Stoxen@yavapai.us
*Attorney for Defendant Yavapai County Recorder*

William J. Kerekes
Office of the Yuma County Attorney
250 West Second Street, Suite G
Yuma, Arizona 85364
(928) 817-4300
YCAttyCivil@yumacountyaz.gov
Bill.Kerekes@yumacountyaz.gov
*Attorney for Defendant Robyn Pouquette, Yuma County Recorder*

/s/ Monse Vejar

4

# EXHIBIT A

1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Arizonans for Fair Elections, et al.,          **NO. CV-20-00658-PHX-DWL**

10                    Plaintiffs,               **JUDGMENT OF DISMISSAL IN A**

11   v.                                         **CIVIL CASE**

12   Katie Hobbs, et al.,

13                    Defendants.

14

15        **Decision by Court.**  This action came for consideration before the Court.  The

16   issues have been considered and a decision has been rendered.

17        IT IS ORDERED AND ADJUDGED that pursuant to the Court's Order filed

18   April 17, 2020, judgment of dismissal due to lack of subject matter jurisdiction is entered.

19   Plaintiff to take nothing, and the complaint and action are dismissed without prejudice.

20                                      Debra D. Lucas
                                        Acting District Court Executive/Clerk of Court
21

22   April 17, 2020

23                                      s/ D. Draper
                              By        Deputy Clerk
24
25
26
27
28

# EXHIBIT B

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizonans for Fair Elections, et al., | No. CV-20-00658-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Katie Hobbs, et al., | |
| Defendants. | |

## INTRODUCTION

In Arizona, the people's right to enact laws via the initiative process is sacrosanct. This right has been enshrined in Arizona's constitution since Arizona's inception, and the debate over whether to adopt it was the "burning" and "most important" question raised during Arizona's constitutional convention. *Whitman v. Moore*, 125 P.2d 445, 450 (Ariz. 1942).

The relevant provisions appear in Article IV of the Arizona constitution. Among other things, Article IV provides that "the people reserve the power to propose laws and amendments to the constitution and to enact or reject such laws and amendments at the polls, independently of the legislature" and that "[u]nder this power ten per centum of the qualified electors shall have the right to propose any measure." *See* Ariz. Const., Art. IV, Part 1, § 1(1), (2). Additionally, and most relevant here, Article IV contains detailed requirements concerning the "[f]orm and contents of initiative and referendum petitions" and "verification." *Id.* §1(9). Those requirements include the following:

> Every initiative or referendum petition . . . shall contain the declaration of each petitioner, for himself, that he is a qualified elector . . . , his post office address, the street and number, if any, of his residence, and the date on which he signed such petition. ***Each sheet containing petitioners' signatures shall be attached to a full and correct copy of the title and text of the measure so proposed to be initiated or referred to the people, and every sheet of every such petition containing signatures shall be verified by the affidavit of the person who circulated said sheet or petition, setting forth that each of the names on said sheet was signed in the presence of the affiant*** and that in the belief of the affiant each signer was a qualified elector . . . .

*Id.* (emphasis added). In other words, the rule in Arizona for over 100 years has been that an initiative proponent must (1) submit a "sheet" containing the signatures of the qualified electors who have agreed to support the initiative, and (2) submit an affidavit from the signature gatherer (also known as the circulator) certifying that he or she was physically present when each qualified elector's signature was obtained.

Although these requirements arise from the constitution, the Arizona Legislature has enacted statutes that reaffirm and effectuate them. Under A.R.S. § 19-112(A), "[e]very qualified elector signing a petition shall do so in the presence of the person who is circulating the petition and who is to execute the affidavit of verification." Under A.R.S. § 19-112(C), "[t]he person before whom the signatures, names and addresses were written on the signature sheet"—that is, the circulator—"shall subscribe and swear before a notary public that each of the names on the sheet was signed and the name and address were printed by the elector and the circulator on the date indicated . . . ." Finally, under A.R.S. § 19-121.01, the Arizona Secretary of State must disregard any signature sheets that aren't accompanied by the required circulator affidavit and disregard any entries on particular sheets in which "the signature of the qualified elector is missing." *Id.* § 19-121.01(A)(1)(d), (A)(3)(a).

Enter the coronavirus. In this lawsuit, the plaintiffs—a pair of ballot measure committees that hope to place initiatives on the ballot for the November 2020 election, plus an individual Arizona voter who wishes to sign the committees' initiative petitions (collectively, "Plaintiffs")—argue that the COVID-19 pandemic has effectively eliminated

their ability to comply with Arizona's rules requiring in-person signature gathering for initiative petitions. Plaintiffs further note that Arizona has already created a system (known as "E-Qual") for obtaining electronic signatures from qualified electors and authorizes the use of that system in one specific context—by candidates for statewide and legislative offices who are gathering signatures for candidate nominating petitions. Thus, Plaintiffs seek a declaration that "the provisions governing the signature-gathering requirements for initiative measures under Title 19, Chapter 1 of the Arizona Revised Statutes, violate the First and Fourteenth Amendments to the United States Constitution during the state of emergency caused by the COVID-19 pandemic" as well as an injunction requiring the Secretary of State "to allow the electronic submission of signatures through E-Qual . . . during the state of emergency in Arizona caused by the COVID-19 pandemic" and precluding Arizona's various county recorders "from striking signatures based solely on their submission in electronic form." (Doc. 1 at 20-21.)

Now pending before the Court is Plaintiffs' motion for temporary restraining order ("TRO"), which essentially seeks the same injunctive relief sought in the complaint. (Doc. 2.) As explained in more detail below, this motion will be denied and this action will be dismissed due to a lack of jurisdiction.

First, Plaintiffs' complaint and moving papers do not challenge Arizona's *constitutional* provisions governing the initiative process. Instead, Plaintiffs only seek to challenge the Arizona *statutes* requiring in-person signature gathering. This approach raises serious doubts about whether the requested relief would even redress Plaintiffs' alleged injuries—as noted, the Arizona constitution has always required in-person signature verification. During the TRO hearing, Plaintiffs attempted to belatedly address this issue by arguing that the solicitation of electronic signatures through the E-Qual system could be deemed "substantial compliance" with Article IV of the Arizona constitution. Not only does this argument seem questionable, but Plaintiffs are effectively asking a federal court to make a guess about an unsettled question of state law and then, based on that guess, overturn a century-old state-law election rule. This outcome would be distressing from a

1   federalism perspective and is precluded by both (1) the rule requiring a party invoking a

2   federal court's subject matter jurisdiction to establish a likelihood of redressability, not the

3   mere possibility of redressability, and (2) the rule requiring a party seeking a TRO—which

4   is an extraordinary remedy never awarded as a matter of right—to clearly demonstrate that

5   the requested relief is necessary to avoid irreparable injury.

6       Second, Plaintiffs have not, in any event, demonstrated a likelihood of success or

7   even serious questions going to the merits of their First and Fourteenth Amendment-based

8   claims.  This is not the first time a litigant has attempted to invoke those provisions to

9   challenge state laws governing the signature gathering process for initiative petitions.

10  Under Ninth Circuit law, such a challenger must show that the law creates a "severe

11  burden" on the ability to successfully place an initiative on the ballot, and burdensomeness

12  is gauged in part by assessing whether a "reasonably diligent" initiative committee could

13  have succeeded despite the law.  Here, although it is undeniable that the COVID-19

14  pandemic is currently wreaking havoc on initiative committees' ability to gather signatures,

15  it is undisputed that some Arizona initiative committees (including one of the committees

16  in this case) had gathered enough signatures to qualify before the pandemic took hold.  It

17  is also undisputed that the two committees in this case didn't start organizing and gathering

18  signatures until the second half of 2019, whereas some of their counterparts began

19  organizing as early as November 2018.  Finally, although it is impossible to predict how

20  the pandemic will play out in the coming weeks and months, it is possible that conditions

21  will abate to the point that in-person signature gathering again becomes viable before the

22  July 2020 submission deadline for signatures.   On this record, Plaintiffs have not

23  demonstrated that Arizona law creates a severe burden that would prevent a reasonably

24  diligent initiative committee from placing its proposed initiative on the ballot.  And because

25  Plaintiffs failed to make this showing, the challenged laws are subject to a relaxed form of

26  scrutiny that is easily satisfied by Arizona's interests in preventing fraud and promoting

27  political speech and civic engagement.

28      Third, in large part because of the considerations discussed above, the Court does

- 4 -

not believe the issuance of a TRO would properly balance the equities or be in the public interest.  Although Plaintiffs are correct that the COVID-19 pandemic constitutes an "extraordinary circumstance[]" that has resulted in "profound" dislocations (Doc. 2 at 10-11), it is also a profound thing for a federal court to rewrite state election laws that have been in place since the 1910s.  The difficulty is underscored by the arguments made by some of the defendants in this case who don't oppose the relief sought by Plaintiffs.  Those state and local officials have identified an array of granular policy choices this Court would need to make in order to effectively implement that relief.  Such an approach would raise significant separation of powers and federalism concerns and run afoul of the Ninth Circuit's exhortation that, "[w]hile we are mindful that federal courts have a duty to ensure that national, state and local elections conform to constitutional standards, we undertake that duty with a clear-eyed and pragmatic sense of the special dangers of excessive judicial interference with the electoral process."  *Soules v. Kauaians for Nukoli Campaign Comm.*, 849 F.2d 1176, 1182-83 (9th Cir. 1988).

## BACKGROUND

A.   <u>The Parties</u>

The three Plaintiffs in this action are (1) Arizonans for Fair Elections (AZAN) ("AFE"), a non-profit corporation that was formed to promote a ballot initiative known as the Fair Elections Act, (2) Arizonans Fed Up with Failing Healthcare (Healthcare Rising) ("HRAZ"), a non-profit corporation that was formed to promote a ballot initiative known as the Stop Surprise Billing and Protect Patients Act, and (3) Randi Turk, "a qualified elector within the State of Arizona who would like to sign the petitions supported by the Committee Plaintiffs but has not yet done so."  (Doc. 1 ¶¶ 3-5.)

The defendants named in the complaint are Katie Hobbs, Arizona's Secretary of State ("the Secretary), and the county recorders from Arizona's 15 counties.  (Doc. 1 ¶¶ 6-7.)  However, after the Secretary made public statements suggesting she would not oppose Plaintiffs' requests, the state of Arizona ("the State"), represented by the Arizona Attorney General, moved to intervene.  (Doc. 46.)  That motion was granted over Plaintiffs'

1    opposition.  (Docs. 59, 61.)[1]

2    B.    Procedural History

3          On April 2, 2020, Plaintiffs filed their complaint and motion for a TRO.  (Docs. 1,

4    2.)   In support of their motion, Plaintiffs filed declarations from four individuals: (1)

5    Anabel Maldonado, a campaign manager for AFE (Doc. 3); (2) Jessica Grennan, a

6    campaign manager for HRAZ (Doc. 4); (3) Randi Turk, the individual Plaintiff (Doc. 5);

7    and (4) Christopher Gallaway, an employee of a company that "provides campaign-related

8    services to clients seeking to place initiatives on the ballot for voting by the electorate"

9    (Doc. 79).

10         That same day, four different initiative committees filed a corrected petition for

11   special action in the Arizona Supreme Court that raises claims and requests similar to those

12   presented here.  *See Arizonans for Second Chances Rehabilitation & Safety et al. v. Hobbs*,

13   No. CV-20-0098-SA.[2]

14         On April 10, 2020, the State filed a corrected response to the TRO motion.  (Doc.

15   77.)   In support of the response, the State provided an affidavit that had been filed by one

16   of the plaintiff-committees in the state-court action.  (Doc. 77-1 at 3-8.)

17         Between April 7-13, 2020, some of the officials named as defendants in the

18   complaint also filed responses to Plaintiffs' motion.  In a nutshell, the county recorders

19   from Pinal and Navajo Counties oppose the TRO request (Docs. 65, 72), the county

20   recorder from Pima County "agrees with Plaintiffs that electronic signature gathering for

21   initiative petitions should be temporarily allowed during the pendency of COVID-19

22   restrictions" (Doc. 53), the Secretary likewise "does not oppose the narrow relief sought

23   by Plaintiffs for this election year," and "[i]ndeed . . . believes that such relief would further

24

25   [1]    The Speaker of the Arizona House of Representatives and the President of the
     Arizona Senate also moved to intervene (Doc. 60) but their request was denied (Doc. 75).

26   [2]    The State has also intervened in the state-court action, the Supreme Court has issued
27   a schedule that calls for briefing to be completed by April 27, 2020, and the Supreme Court
     has announced no oral argument will be held.   The docket is available at
28   https://apps.supremecourt.az.gov/aacc/appella/ASC/CV/CV200098.pdf.

the public interest by protecting public health while facilitating continuity of democratic processes," but "requests that the Court place certain limitations on the relief to minimize administrative burden under the current circumstances" (Doc. 78), and the county recorders from Maricopa, Yuma, Mohave, and Santa Cruz Counties "take no position" on the merits of Plaintiffs' request (Docs. 62, 67, 73, 85).

Additionally, between April 10-14, 2020, the Court authorized the filing of amicus briefs by the Arizona Republican Party (Doc. 86), the Arizona Free Enterprise Club (Doc. 87), and the Goldwater Institute (Doc. 92).

On April 14, 2020, the Court held a telephonic hearing on the motion for a TRO. (Docs. 90, 102.)  The bulk of the argument was provided by counsel for Plaintiffs and the State, and counsel for the Secretary and the Maricopa County recorder also provided remarks.  (*Id.*)  Media organizations and members of the public were allowed to listen to the hearing telephonically.  (Doc. 68.)

On April 16, 2020, the State conditionally moved to certify certain questions to the Arizona Supreme Court.  (Docs. 99, 100.)  Specifically, the State requested that, if the Court determined this case turned on whether signatures gathered through E-Qual would "substantially comply" with the Arizona constitution, the Court certify that issue to the Arizona Supreme Court.  (Doc. 100 at 2.)  The State further requested that, if the Court found that certain provisions of the Arizona constitution violated the First and Fourteenth Amendments, it certify the question of whether those provisions could be severed from the rest of the constitution.  (*Id.* at 2-3.)  Plaintiffs oppose the certification request, arguing that both questions are unnecessary to resolve their motion.  (Doc. 101.)

**ANALYSIS**

I.      Standing

The State asserts that Plaintiffs lack standing to pursue this action.  (Doc. 77 at 3-4.)  Specifically, the State argues that Plaintiffs have only sought to enjoin the statutory provisions in Title 19 governing signature collection but have not challenged the provisions of Article IV of the Arizona constitution that, by and large, impose the same requirements.

- 7 -

1   (*Id.*)  In the State's view, this creates a standing problem—even if Plaintiffs succeed in

2   arguing that Title 19 is unconstitutional, the Arizona constitution would stand and

3   Plaintiffs' injury would not be redressed.  (*Id.*)[3]  During oral argument, Plaintiffs responded

4   by acknowledging that they are not challenging Article IV of the Arizona constitution but

5   arguing that the requested relief would still redress their injury because, once Title 19's

6   requirements are stripped away, the Arizona courts would be free to conclude that

7   gathering electronic signatures via E-Qual during a pandemic qualifies as "substantial

8   compliance" with Article IV's requirements.

9          Plaintiffs' arguments are unavailing.  "A litigant must demonstrate . . . a substantial

10  likelihood that the judicial relief requested will prevent or redress the claimed injury to

11  satisfy the 'case or controversy' requirement."  *Duke Power Co. v. Carolina Env't Study*

12  *Grp., Inc.*, 438 U.S. 59, 79 (1978).  Thus, "[t]o establish redressability, a plaintiff must

13  show that it is 'likely, as opposed to merely speculative, that the injury will be redressed

14  by a favorable decision.'"  *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting

15  *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992)).  Here, it is entirely speculative that

16  Arizona courts would conclude that gathering electronic signatures through the E-Qual

17  system constitutes "substantial compliance" with Article IV's requirements.

18         As an initial matter, it is not entirely clear that Arizona courts would apply a

19  "substantial compliance" standard in this context.  It's true that Arizona courts have

20  frequently stated that "[w]hen considering challenges to the form of initiative petitions,

21  Arizona courts follow a rule of substantial compliance."  *Wilhelm v. Brewer*, 192 P.3d 404,

22  405 (Ariz. 2008).  The origin of this standard dates back to 1914, when the Arizona

23  Supreme Court decided *Arizona v. Osborn*, 143 P. 117 (Ariz. 1914).  The plaintiffs in that

24  case sought to prevent an initiative from being placed on the ballot by invoking a statute

25

26  _____

    [3]       Several amici make variants of the same argument.  (Doc. 87 at 2 ["The elephant in
27  the room is the Plaintiffs' failure to discuss the Arizona Constitution, and . . . the E-Qual
    system . . . cannot be instituted in a manner that is in compliance with the Arizona
    Constitution's provisions on the right to initiative itself."]; Doc. 92 at 5 ["[T]he relief
28  Plaintiffs request would violate the Arizona Constitution, which expressly requires in-
    person signature gathering for initiatives."].)

that authorized courts to enjoin the secretary of state from certifying an initiative "[o]n a showing that any petition is not legally sufficient." *Id.* at 117. In addressing whether the challenged petition was "legally sufficient," the court examined the statutory law of states with similar initiative procedures and concluded that the words "legally sufficient" in the statute indicated "the Legislature meant to describe a valid petition, signed by legal voters, and complying substantially, not necessarily technically, with the requirements of the law." *Id.* at 118 (quoting *Oregon v. Olcott*, 125 P. 303, 304 (Ore. 1912)).

*Osborn* has served as the foundation for the Arizona courts' subsequent application of the "substantial compliance" standard. *Kromko v. Superior Court*, 811 P.2d 12, 19 (Ariz. 1991) ("The term 'legal sufficiency, as used [in a statute], requires substantial, not necessarily technical, compliance with the requirements of the law.") (quoting *Osborn*); *Feldmeier v. Watson*, 123 P.3d 180, 183 (Ariz. 2005) (citing *Kromko*); *Wilhelm*, 192 P.3d at 405 (citing *Feldmeier*). However, it appears that no case applying that standard expressly rooted it in the Arizona Constitution. Some, like *Osborn*, instead focused on statutory interpretation. *Kromko*, 811 P.2d at 19. Thus, whether substantial compliance survives as the applicable standard may be called into question by the Arizona Legislature's enactment in 2017 of A.R.S. § 19-102.01, which requires strict compliance with statutory and constitutional requirements. It is notable that the Arizona Supreme Court has, thus far, avoided answering that question. *Stanwitz v. Reagan*, 429 P.3d 1138, 1142 (Ariz. 2018) ("As our decision does not turn on whether the Committee strictly complied with § 19-118(C), we need not determine the constitutionality of the strict compliance requirement of § 19-102.01(A)."). *See also Morales v. Archibald*, 439 P.3d 1179, 1181 (Ariz. 2019).

But even assuming that "substantial compliance" survives as the applicable standard in Arizona, it is entirely speculative that the Arizona courts would deem the gathering of electronic signatures via E-Qual to be substantially compliant with Article IV's requirements. Again, the text of Article IV requires an initiative proponent to submit an "affidavit of the person who circulated said sheet or petition, setting forth that each of the names on said sheet was signed in the presence of the affiant . . . ." Ariz. Const., Art. IV,

Part 1, § 1(9). The Arizona courts have repeatedly commented upon the importance and significance of this physical-presence requirement. *See, e.g., Stanwitz*, 429 P.3d at 1143 ("[W]e note that the Arizona Constitution specifically envisions a signature verification requirement . . . and this Court has observed that '[t]he circulator is the only person in the process who is required to make a sworn statement and is, therefore, the person under the greatest compulsion to lend credibility to the process.'") (citation omitted). Thus, even though the "substantial compliance" standard allows Arizona courts to overlook "technical" errors and "errors in petition formalities" if they do not undermine "the purposes of the relevant statutory or constitutional requirements," *Wilhelm*, 192 P.3d at 405, it is difficult to see how non-compliance with the physical-presence requirement could be disregarded under these standards. *Cf. Porter v. McCuen*, 839 S.W.2d 521, 523 (Ark. 1992) (rejecting request "not to impose too rigid a standard of compliance with the requirement that signatures be obtained 'in the presence' of the person circulating the petition" and concluding "that where the signatures are gathered in areas and places while the canvasser is neither physically or proximately present . . . substantial compliance is lacking").

One final point is worth emphasizing. Whether the use of E-Qual could be deemed substantially compliant with Article IV's requirements is a pure question of state law. It is also a question the Arizona Supreme Court may be asked to decide in the coming weeks in the parallel lawsuit noted above.[4] These circumstances amplify the federalism concerns

---

[4] Although two amici suggest the Court should abstain from hearing this case under the *Pullman* abstention doctrine (Doc.86 at 7-8; Doc. 92 at 7), Plaintiffs and the State both asserted during oral argument that *Pullman* abstention is unwarranted. The Court agrees. "*Pullman* abstention is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy that is properly before it," *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (citation omitted), and the Ninth Circuit has emphasized that *Pullman* abstention is particularly inappropriate in cases—like this case—involving First Amendment challenges. *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 528 (9th Cir. 2015) ("It is rarely appropriate for a federal court to abstain under *Pullman* in a First Amendment case.") (citation omitted). Additionally, although it might theoretically be possible to certify the "substantial compliance" question to the Arizona Supreme Court, *see generally Doyle v. City of Medford*, 565 F.3d 536, 543 (9th Cir. 2009) ("[W]e could simply abstain from deciding this case under the *Pullman* doctrine . . . [but] certification is appropriate in *Pullman*-type abstention cases . . . ."), there is no need to pursue certification here because the unsettled nature of the question alone is enough to prevent Plaintiffs from meeting their burden of establishing a likelihood of redressability

- 10 -

that would flow from ruling in Plaintiffs' favor on a TRO request.  *Cf. M.S.*, 902 F.3d at 1090 (acknowledging that "[t]he interaction between the federalism limits on a district court's remedial power . . . and a district court's power in general to order prospective relief against state executive officials . . . remains an open and contentious area of the law" but concluding that "where, as here, a plaintiff sues state officials seeking intrusive affirmative relief that is incompatible with democratic principles and where there is no basis for the district court to invoke its equitable power, such relief would also violate principles of federalism").

## II.   Merits

Plaintiffs' failure to establish redressability means this action must be dismissed due to a lack of subject matter jurisdiction—an outcome that, in turn, means Plaintiffs' TRO request must be denied as moot.  *See, e.g., Appalachian Voices v. Bodman*, 587 F. Supp. 2d 79, 83 (D.D.C. 2008) ("[B]ecause the court determines that the plaintiffs lack standing, the court . . . denies as moot the plaintiffs' motion for a preliminary injunction."). Nevertheless, to provide a complete record in the event of appellate review, the Court will proceed to analyze the merits of the TRO request.

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted).  *See also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").   A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  "But if a plaintiff can only

and, relatedly, a likelihood that the requested relief is necessary to avoid irreparable harm. Indeed, the parties have not identified any precedent supporting the issuance of a certified question in the middle of a TRO proceeding and such an approach would seem self-defeating—the whole point of a TRO is that the plaintiff needs immediate relief.  That is why the law places such a heavy burden on the party seeking a TRO and authorizes the issuance of a TRO only in cases presenting a clear entitlement to relief.

show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quotation omitted).  Under this serious-questions variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680 F.3d at 1072.

 Regardless of which standard applies, the movant "carries the burden of proof on each element of the test."  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).  Further, there is a heightened burden where a plaintiff seeks a mandatory preliminary injunction, which should not be granted "unless the facts and law clearly favor the plaintiff."  *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986). A court should not issue such an injunction "unless extreme or very serious damage will result."  *Marlyn Nutraceuticals v. Mucos Pharma Gmbh & Co.*, 571 F.3d 873, 878-89 (9th Cir. 2009).  They "are not issued in doubtful cases." *Id.*

A.   **Likelihood of Success**

1.   <u>Appropriate Standard</u>

It is necessary to begin by identifying the correct test governing Plaintiffs' claims. The State argues, and Plaintiffs seem to agree, that the *Anderson*/*Burdick* framework supplies the relevant test.[5]  That framework is a flexible approach that balances the severity of the restriction against the government's purported interest.  *Dudum v. Arntz*, 640 F.3d 1098, 1105-1106 (9th Cir. 2011).  Severe restrictions trigger strict scrutiny, but less-than-severe restrictions only require the government to demonstrate "important regulatory interests."  *Id.*

The State cites *Dudum* as establishing that "*all* constitutional challenges to election regulations are governed by" the *Anderson*/*Burdick* framework.  (Doc. 74 at 8.)  *Dudum*,

---

[5]    This framework draws its name from *Anderson v. Celebreeze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).

however, focused specifically on "[r]estrictions on voting," 640 F.3d at 1105,[6] and the Ninth Circuit has suggested in subsequent decisions that ballot access regulations (and, in particular, regulations governing the signature gathering process for initiative petitions) raise unique issues that aren't present in pure voting restriction cases. *Angle v. Miller*, 673 F.3d 1122, 1130 (9th Cir. 2012) ("Although . . . a district-by-district system of counting *votes* in a statewide election would violate equal protection, . . . district-by-district counting of *signatures* obtained to qualify an initiative for the ballot [does not] present[] the same problem.  Votes and petition signatures are similar in some respects, but ballot access requirements and elections serve different purposes.") (citations omitted).  Thus, before turning to the parties' specific arguments, it is helpful to begin by summarizing the two most analogous Ninth Circuit decisions involving challenges to state laws governing the signature gathering process for initiative petitions.

First, *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006), involved a challenge to an Oregon law that "prohibit[ed] . . . payment to electoral petition signature gatherers on a . . . per signature basis." *Id.* at 951.  The plaintiffs argued this law violated the First Amendment but the district court rejected their challenge and the Ninth Circuit affirmed. *Id.*  The court began by noting that, although "the circulation of initiative and referendum petitions involves core political speech," state regulation in this area is "inevitabl[e]" and "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process." *Id.* at 961 (citations and internal quotation marks omitted).  Thus, the court held that the plaintiffs' First Amendment challenge was governed by the same general test later articulated in *Dudum*: severely burdensome regulations must pass strict scrutiny, but less burdensome regulations trigger less exacting review. *Id.*  As for the first part of this test—whether the law created a "'Severe' or 'Lesser' Burden"— the court concluded it created a lesser burden because, among other things, (1) the

---

[6]      Specifically, *Dudum* involved a challenge to San Francisco's practice, following the its adoption of the instant runoff voting method, to restrict the number of rankings on each ballot to three.  640 F.3d at 1100-02.  The *Dudum* plaintiffs argued this limitation was unconstitutional because it had the practical effect of disenfranchising certain voters and/or diluting certain votes. *Id.* at 1107-14.

declarations proffered by the plaintiffs to illustrate the supposed difficulty of gathering signatures under the law were based on "unsupported speculation" (*id.* at 964-65), and (2) at least one referendum petition qualified for the ballot after the enactment of the law and it had a relatively low signature error rate (*id.* at 966-67).  This finding, in turn, meant that the challenged law was only subject to "less exacting review," and the court concluded that Oregon's "important regulatory interest in preventing fraud and its appearances in its electoral processes" was sufficient to insulate the law from constitutional challenge.  *Id.* at 969-71.[7]

Next, *Angle* involved a challenge to a Nevada law that required the proponents of a ballot initiative to obtain signatures from at least 10% of the registered voters in each of Nevada's congressional districts.  673 F.3d at 1126-27.  The plaintiffs argued this law violated the First Amendment but the district court rejected this claim and the Ninth Circuit affirmed.[8]  *Id.* at 1127.  The court analyzed the claim under the same test it had applied in *Prete*—that is, an initial assessment of whether the regulation resulted in a "severe burden[]" on the plaintiffs' First Amendment rights, then the application of either strict scrutiny or "less exacting review" depending on the outcome of that assessment.  *Id.* at 1132.

During the first step of that analysis, the court noted that "restrictions on the initiative process" have the potential to create two different types of First Amendment burdens: first, they can "restrict one-on-one communication between petition circulators and voters," and second, they "can make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot, thus limiting their ability to make the matter the focus of statewide discussion."  *Id.* (citations and internal quotation

---

[7]     The *Prete* court also noted that Oregon law (like Arizona law) requires that "[p]etition circulators must certify that the signatures on the petitions were obtained in the presence of the circulator . . . ."  *Id.* at 969 n.26.

[8]     The plaintiffs in *Angle* also raised an unsuccessful equal protection challenge to the Nevada law, *id.* at 1127-32, but it is unnecessary to summarize the Ninth Circuit's equal protection analysis because this case does not involve an equal protection challenge.  The absence of an equal protection claim also distinguishes this case from *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073 (9th Cir. 2003), which invalidated an Idaho law governing the signature requirements for initiative petitions on equal protection grounds.

marks omitted).  The court concluded the first category was inapplicable because the challenged Nevada law "does not restrict one-on-one communication between petition circulators and votes" and indeed "likely *increases* the total quantum of speech on public issues, by requiring initiative proponents to carry their messages to voters in different parts of the state."  *Id.* at 1132-33 (citation and internal quotation marks omitted).  As for the second category, the court stated that the test was whether a "reasonably diligent" initiative campaign could have secured a place on the ballot despite the challenged regulation.  *Id.* at 1133 (citing *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008)).  Although the plaintiffs had submitted declarations asserting that the regulation would inhibit their ability to place initiatives on the ballot, the court concluded these affidavits were "too vague, conclusory and speculative" and also noted that the plaintiffs had failed to present evidence that "other initiative proponents have been unable to qualify initiatives for the ballot as a result of the [challenged law]."  *Id.* at 1133-34.  Given this backdrop, the court applied less exacting scrutiny and concluded the law passed constitutional muster because it was supported by important regulatory interests—Nevada's interests in ensuring state-wide support for initiatives and avoiding voter confusion.  *Id.* at 1134-36.

In sum, under *Prete* and *Angle*, Plaintiffs bear the initial burden of showing that the challenged provisions of Title 19 impose a severe burden on their First Amendment rights.  Such a burden may take the form of an impediment on their ability to engage in one-on-one communication or a limitation on their ability to actually earn a place on the ballot.  If Plaintiffs demonstrate the existence of severe burden, strict scrutiny applies, but if not, a relaxed degree of scrutiny applies.  *See also Ariz. Green Party v. Reagan*, 838 F.3d 983, 985 (9th Cir. 2016) ("Ballot access litigation follows a common pattern.  The scrutiny courts employ . . . turns on the severity the law imposes on . . . First and Fourteenth Amendment rights.  The plaintiff bears the burden of showing the severity of the burden on those constitutional rights; evidence that the burden is severe, de minimis, or something in between, sets the stage for the analysis by determining how compelling the state's interest must be to justify the law in question."); *id.* at 988 ("This is a sliding scale test,

where the more severe the burden, the more compelling the state's interest must be, such that a state may justify election regulations imposing a lesser burden by demonstrating that the state has important regulatory interests.") (quotation omitted).[9]

### 2.   Whether The Burden Is Severe

As noted, initiative-related regulations can create two different types of First Amendment harms: (1) they can inhibit one-on-one communication with voters, and/or (2) they can interfere with the proponents' ability to secure a place on the ballot.  Although Plaintiffs focus primarily on the second type of harm in their complaint and moving papers,[10] some portions of the complaint can be interpreted as alleging the first type of harm.  (*See, e.g.,* Doc. 1 ¶¶ 85-87 [arguing that "[t]he First Amendment is at the core of petition circulation . . . because it involves interactive communication concerning political change," that such "advancement of beliefs and ideas[] is an inseparable aspect of the liberty assured by the Due Process Clause of the Fourteenth Amendment," and that "[t]he Secretary's strict enforcement of A.R.S. § 19-112 . . . unduly burdens the public's right to engage in political speech during the COVID-19 pandemic").

To the extent Plaintiffs intended to allege the first type of harm, their claim is unavailing.  The in-person signature requirements of Title 19 affirmatively promote speech. *See, e.g., Angle*, 673 F.3d at 1132-33 (stating that Nevada's signature requirements "likely *increase*[*d*] the total quantum of speech on public issues, by requiring initiative proponents to carry their messages to voters in different parts of the state").  To the extent Plaintiffs aren't currently able to engage in face-to-face interaction with qualified electors, that's the fault of the COVID-19 pandemic, not the Title 19 requirements.  It's only when a state law bars certain individuals from serving as petition circulators that the first category of First Amendment harm might arise.  *Compare Meyer v. Grant,* 486 U.S. 414, 422-23 (1986)

---

[9]   In any event, the level of review is something more than rational basis. *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1025 (9th Cir. 2016) (en banc).

[10]   *See, e.g.,* Doc. 1 ¶ 78 ("Absent injunctive relief, Plaintiff[s] will suffer irreparable injury . . . [because] it is impossible for Plaintiffs [to] obtain signatures during the pandemic to qualify their measure for the ballot."); Doc. 2 at 14 ("The injury to the Plaintiffs is the Plaintiffs not being able to obtain the required number of signatures by the July 2, 2020 deadline . . . .").

1  (holding that a Colorado law was unconstitutional in part because "it limits the number of

2  voices who will convey appellees' message and the hours they can speak").

3      Plaintiffs' arguments concerning the second category of harm present a closer call.

4  Plaintiffs contend they were forced to stop collecting signatures in mid-March 2020 due to

5  the outbreak of the pandemic.   At the time of cessation, AFE had collected 110,033

6  signatures (Doc. 3 ¶ 29) and HRAZ had collected 273,786 signatures (Doc. 4 ¶ 17).   During

7  this election cycle, Arizona law requires at least 237,645 valid signatures—meaning that

8  HRAZ has already collected more than the minimum number—but Plaintiffs have

9  submitted a declaration from Christopher Gallaway, their professional organizer, who

10 avers that, "[i]n my experience, ballot initiative committees should obtain one and a half

11 to two times the number of required signatures to account for signature sheets that may be

12 eliminated and signatures that may be stricken for deficiencies.   In this case, it means that

13 [Plaintiffs] should obtain between 356,468 to 475,290 signatures."   (Doc. 79 ¶ 27.)   Mr.

14 Gallaway also states in his declaration that, but for the COVID-19 outbreak, his firm "could

15 have gathered an average of 160,000 signatures per initiative campaign" during the period

16 between March 11, 2020 and April 30, 2020, which is period of time during which

17 government entities have ordered or recommended social distancing.   (*Id.* ¶ 47.)   Finally,

18 Plaintiffs and Mr. Gallaway all state in their respective declarations that it is impossible as

19 a practical matter to gather any new signatures while the various government orders remain

20 in effect.   (Doc. 3 ¶¶ 31-33; Doc. 4 ¶¶ 19-25; Doc. 79 ¶¶ 35-46.)

21     In response, the State offers four reasons why the burdens on Plaintiffs arising from

22 Title 19's signature-gathering requirements shouldn't be considered severe.   (Doc. 77 at 5-

23 9.)   Three of those arguments are unpersuasive.   First, the State argues that Plaintiffs

24 haven't *really* shown that it's impractical to keep gathering in-person signatures in the

25 present environment because "[n]one of the Plaintiffs['] declarants appear to consider

26 genuinely measures such as using single-use signature sheets, social distancing, or

27 scheduling petition signing in advance at prepared and sanitary locations.   Perhaps those

28 measures would be sufficient.   Perhaps not.   But Plaintiffs bear the burden of proof, and

- 17 -

their declarations are simply too thin a reed to satisfy it." (*Id.* at 6.)  The Court appreciates the State's emphasis on the burden of proof, but Plaintiffs' averments on this point are compelling and consistent with common sense.  The fact the TRO hearing was held telephonically, pursuant to a recent General Order postponing most court hearings in the District of Arizona and requiring that all others be held "in the safest manner possible" and "scheduled and conducted by video teleconference or telephone to the extent possible" (D. Ariz. G.O. 20-17), underscores this point.

Second, the State contends that, because the challenged Title 19 requirements "are viewpoint-neutral and even handed[,] applying to *all* initiatives regardless of their subject matter or position," this viewpoint neutrality "militates against finding a severe burden." (Doc. 77 at 8.)  The problem with this argument is that it conflates First Amendment principles that apply in other contexts with the specific inquiry required under *Angle*— whether the burden created by the challenged regulation should be considered "severe" because it "make[s] it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot."  673 F.3d at 1132.[11]  *Angle* itself involved a viewpoint-neutral law, yet the Ninth Circuit didn't suggest that a different or less stringent test applied due to its neutrality.

Third, during oral argument, the State asserted—in response to a hypothetical question about whether a pandemic that persisted across an entire election cycle could be considered a severe burden—that "it's important to note that there's no constitutional right to make laws by petition at all.  And, in fact, most states do not do so.  So if that were actually the case, Arizona would for that election cycle simply become like most other states in not having an opportunity to law make by initiative."  (Doc. 102 at 42-43.)  This argument, like the previous one, is foreclosed by *Angle*, which repeatedly emphasized that, although a state is not required to allow its citizens to enact legislation through the initiative

---

[11]    The case cited by the State in support of its viewpoint-neutrality argument, *Chamness v. Bowen*, 722 F.3d 1110 (9th Cir. 2013), involved a constitutional challenge to a California law that "eliminat[ed] party primaries and general elections with party-nominated candidates, and substitute[ed] a nonpartisan primary and a two-candidate runoff."  *Id.* at 1112.

process, a state that chooses to make that process available must not restrict it in an unconstitutional manner. *See, e.g.,* 673 F.3d at 1127-28 (although a "state may decline to grant a right to legislate through ballot initiatives . . . when a state chooses to give its citizens the right to enact laws by initiative, it subjects itself to the requirements of the Equal Protection Clause") (citations and internal quotation marks omitted); *id.* at 1133 (although "[t]here is no First Amendment right to place an initiative on the ballot . . . we assume that ballot access restrictions . . . trigger strict scrutiny[] when they significantly limit the ability of initiative proponents to place initiatives on the ballot"); *id.* at 1133 n.5 ("The state's power to ban initiatives thus does not include a lesser power to restrict them in ways that unduly hinder political speech").

The State's final argument—diligence—has more force.  The State notes that Plaintiffs could have begun organizing and gathering signatures in November 2018 (as at least one other initiative committee did) yet didn't file the necessary registration paperwork with the Secretary until August 20, 2019 (HRAZ) and October 30, 2019 (AFE), thereby wasting between 45% and 55% of the 20-month election cycle.  (Doc. 77 at 5-7 & nn.3, 6.) In contrast, the State notes that the government-issued social distancing guidelines arising from the COVID-19 pandemic, which came into effect on March 11, 2020, will cover only 7.5% to 12.5% of the election cycle, depending on whether they remain in effect through April 30, 2020 or May 31, 2020.  (*Id.*)  And the States notes that a different committee, which is serving as one of the plaintiffs in the state-court lawsuit, had already gathered around 300,000 signatures by the time of the pandemic outbreak.  (*Id.* at 7, citing Doc. 77-1 at 5 ¶ 5.)  Given all of this, the State concludes: "It was *Plaintiffs' choice*—not the State's—to procrastinate and dither away time that might later become critical.  Plaintiffs' delay absolutely dwarfs the time period that COVID-19 is likely to affect their signature gathering efforts. . . .  [I]t appears likely that Plaintiffs could have qualified for the ballot had they exerted reasonable diligence."  (*Id.* at 6-7.)

The Court agrees with the State that, on this record, Plaintiffs have not established that the Title 19 requirements create a "severe burden" on the ability to place an initiative

on the ballot.  As noted, "the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' initiative proponents can gain a place for their proposed initiative on the ballot."  *Angle*, 673 F.3d at 1133 (quotation omitted).  The party challenging the regulation bears the burden of establishing severity.  *Reagan*, 838 F.3d at 989.  "Speculation, without supporting evidence," is insufficient to demonstrate that the statutory scheme results in a severe burden.  *Angle*, 673 F.3d at 1134; *Prete*, 438 F.3d at 964 (rejecting "unsupported speculation" as insufficient to demonstrate severe burden).

Here, a "reasonably diligent" committee could have placed its initiative on the November 2020 ballot despite the Title 19 requirements and the COVID-19 outbreak.  It is notable that Plaintiffs' declarations fail to provide any explanation (let alone justification) for why they waited so long to begin organizing and gathering signatures. The State has presented evidence that at least one Arizona initiative committee began that process in November 2018, yet the two committees in this case waited until the second half of 2019, thereby missing out on essentially a year's worth of time to work toward the 237,645 signature cutoff.[12]  Moreover, notwithstanding that delay, one of the Plaintiffs was able to gather over 270,000 signatures—much more than the amount required under state law, albeit not enough to provide the buffer recommended by Mr. Gallaway—in the few months it was operating, and a different Arizona committee was able to gather around 300,000 signatures during the same abbreviated timeframe.  All of this strongly suggests that, had Plaintiffs simply started gathering signatures earlier, they could have gathered more than enough to qualify for the ballot before the COVID-19 pandemic started interfering with their efforts.

---

[12]     The Court recognizes there may be sound reasons for an initiative committee to delay the ramp-up process until the latter part of the election cycle and that it may be the norm for committees to engage in such delay.  The difficulty here is that Plaintiffs haven't proffered any *evidence* of those reasons and norms in their declarations.  (Doc. 102 at 33 [Plaintiffs' acknowledgement that "we haven't provided evidence that it's typical"].)  It's hornbook law that the party seeking a TRO bears the burden of establishing a clear entitlement to relief, and *Prete* and *Angle* emphasize that, even outside the TRO context, the party raising a constitutional challenge to a state electoral law must present non-speculative evidence in support of its claim that the law creates a severe burden.

This analysis, to be clear, should not be interpreted as a criticism of Plaintiffs.  They are hardly the only members of our community who failed to anticipate and plan for a once-in-a-century pandemic.  But the relief they are seeking in this case is profound—the displacement of a bedrock component of Arizona law.  Such laws should not be wantonly overturned, and that is why courts (including the Ninth Circuit) require parties raising constitutional challenges to state ballot access laws to show not only that *they* have been thwarted by the law, but that a reasonably diligent party would have been thwarted, too.  Thus, in *Prete*, the Ninth Circuit rejected the challenge to Oregon's law in part because a different referendum campaign was able to "qualif[y] for the . . . Oregon ballot, *after* the passage of [the challenged law]"—an outcome that "weighs against plaintiffs' claim."  438 F.3d at 967.  Similarly, in *Angle*, the Ninth Circuit rejected the challenge to Nevada's law in part because the plaintiffs "have not presented any evidence" that "other initiative proponents have been unable to qualify initiatives for the ballot as a result of the [challenged law]."  673 F.3d at 1134.[13]

Finally, the Court is unpersuaded by Plaintiffs' citation of three decisions in which other courts issued emergency injunctive relief in an attempt to address unanticipated electoral dislocations.  As an initial matter, none of those decisions were issued by courts in the Ninth Circuit and none applied the Ninth Circuit standards addressed above.  Additionally, each is distinguishable for other reasons.

First, in *Florida Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016), the plaintiffs sought a TRO requiring an emergency extension of Florida's voter registration deadline because "[j]ust five days before that deadline . . . Hurricane Matthew bore down and unleashed its wrath on the State of Florida.  Life-threatening winds and rain forced many Floridians to evacuate or, at a minimum, hunker down in shelters or their homes."  *Id.* at 1254.  The district court concluded that because "Florida's statutory

---

[13]    For these reasons, Plaintiffs' contention that they "lost the opportunity to collect up to 160,000 signatures between March 11, 2020, and April 30, 2020" due to the combination of Title 19 and the COVID-19 responses (Doc. 79 ¶ 47) misses the mark.  Even assuming that 160,000 figure is accurate, a reasonably diligent campaign wouldn't have needed to put all of its eggs in the March/April basket.

framework would categorically deny the right to vote" to those who failed to register before the hurricane, it amounted to a severe burden that warranted strict scrutiny. *Id.* at 1257.

Second, Plaintiffs cite *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1320819 (W.D. Wis. 2020). There, the plaintiffs sought a TRO extending the date by which individuals could register to vote electronically, rather than in-person, in light of the COVID-19 pandemic. The court, relying on *Florida Democratic Party*, found that the existing voter registration deadline presented an "excruciating dilemma that will soon be faced by eligible voters . . . [to] either venture into public spaces, contrary to public directives and health guidelines or stay at home and lose the opportunity to vote." *Id.* at *5. The court concluded that the dilemma presented "an undue burden" and that Wisconsin's proffered reasons for maintaining the deadline were insufficient to justify it. *Id.* at *5-*6.

The key difference between those cases and this one is that *Florida Democratic Party* and *Bostelmann* were both voting restriction cases, while this is a ballot access case. As discussed above, the overarching standard is the same, but the key distinction comes in how courts analyze whether a severe burden is present. When assessing whether a state law presents a severe burden on ballot access, courts in the Ninth Circuit look to whether a reasonably diligent initiative proponent would have been able to get the issue on the ballot despite the law. Regulations on the right to vote, in contrast, do not apply the "reasonably diligent" standard. *See, e.g.*, *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1023-1027 (9th Cir. 2016); *Dudum*, 640 F.3d at 1105-07. *See also Angle*, 673 F.3d at 1130 ("Votes and petition signatures are similar in some respects, but ballot access requirements and elections serve different purposes."). Notably, neither *Florida Democratic Party* nor *Bostelmann* examined whether a reasonably diligent voter would have already registered by the time the respective crises struck.[14]

---

[14]      Additionally, Plaintiffs fail to cite recent decisions by other federal courts in Wisconsin denying similar claims for relief. *Taylor v. Milwaukee Election Comm'n*, 2020 WL 1695454, *9 (E.D. Wisc. 2020) (denying motion for preliminary injunction to postpone the Wisconsin election in light of the COVID-19 pandemic: "[I]t appears that tomorrow morning, those who have not yet voted will face a grim choice: go out to the polling places (the ones that are open) and risk being exposed to the virus or spreading it

Plaintiffs' final case is *Faulkner v. Va. Dep't of Elections*, CL-20-1456 (Va. Cir. Ct. 2020).  There, a Virginia trial court enjoined enforcement of a Virginia statute requiring a political candidate to gather a certain number of signatures in order to appear on the 2020 primary ballot.  *Id.* at 3.  The court found that, in light of the ongoing COVID-19 pandemic, the statute imposed a "significant" burden and was therefore subject to strict scrutiny.  *Id.* at 2-3.  Absent from the court's order, however, is any discussion of whether a reasonably diligent candidate would have acquired enough signatures in spite of the statute.  *Id.* Regardless of the reason for that omission, this Court is bound by Ninth Circuit law, which requires an examination of what a reasonably diligent proponent would have accomplished in the same circumstances.

### 3.    Important Regulatory Interest

"Because [Plaintiffs] have not shown that [Title 19] imposes severe burdens, the state need show only that the rule furthers an important regulatory interest."  *Angle*, 1134-35.  Additionally, the State need not demonstrate that the rule is narrowly tailored to promote that interest.  *Dudum*, 640 F.3d at 1114 ("[W]e emphasize that the City is *not* required to show that its system is narrowly tailored . . . . [W]hen a challenged rule imposes only limited burdens on the right to vote, there is no requirement that the rule is the only or the best way to further the proffered interests.").

The Supreme Court has recognized that Arizona (like other states) "indisputably has a compelling interest in preserving the integrity of its election process. Confidence in the integrity of our electoral processes is essential to the function of our participatory democracy."  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted).  Here, the provisions of Title 19 are clearly aimed at maintaining the integrity of the initiative process. The Arizona Legislature has declared that "strict compliance with the constitutional and

---

to their friends and neighbors, or forego one of the most sacred rights of citizenship—the right to have a say in the governance of their communities, their state and their nation. 'Extraordinary' is a feeble description of the circumstances that appear to be leading to that choice.  But this court must hold . . . that this federal court does not have the authority 'to act as the state's chief health official' by making the decision that needs to be made to put the health and safety of the community first. . . . The court DENIES the plaintiffs' motion for preliminary injunction.").

statutory requirements for the referendum process and in the application and enforcement of those requirements provides the surest method for *safeguarding the integrity and accuracy* of the referendum process." A.R.S. § 19-101.01 (emphasis added). It has made the same finding with respect to the initiative process. *Id.* § 19-102.01(A). And the Arizona Supreme Court has held that Title 19's regulation of signature gatherers "represents a reasonable means of fostering transparency . . . and mitigating the threat of fraud or other wrongdoing infecting the petition process." *Stanwitz,* 429 P.3d at 1144.

Plaintiffs do not appear to seriously contest this point. They acknowledge the State's interest in "ensur[ing] that the hundreds of thousands of required signatures on the ballot come from qualified electors." (Doc. 2 at 12.) Further, they don't argue that Title 19's requirements would fail under a standard of review below strict scrutiny. (*Id.* ["Under ordinary circumstances, requiring [in-person] gathering of signatures would provide somewhat of a burden, but it could arguably be justified by the State's interest in preventing fraud . . . ."].) Thus, it would seem that all agree that the State has an important regulatory interest that satisfies the second component of the analysis. *See also Prete*, 438 F.3d at 969 (Oregon's law restricting use of paid signature gatherers was supported by Oregon's "important regulatory interest in preventing fraud and its appearances in its electoral processes").[15]

Finally, the State also argues that Title 19's requirements further the "significant interest in promoting dialogue by requiring proponents of initiatives to individually engage signers and in doing so provide opportunity for meaningful discussion." (Doc. 77 at 10.) Although neither party has cited any case addressing whether this interest qualifies an important regulatory interest for purposes of the *Prete/Angle* framework, common sense

---

[15]   Given this conclusion, the Court need not resolve amicus's contention that the E-Qual system would be worse than the Title 19 requirements at preventing fraud (Doc. 86 at 2 ["E-Qual Is Highly Susceptible To Fraud"]) or Plaintiffs' rejoinder during oral argument that E-Qual may be better than the Title 19 requirements at preventing fraud. As noted, when an electoral rule doesn't create a severe burden, the state isn't required to show that it constitutes the best way to promote the regulatory interest at issue. *Dudum*, 640 F.3d at 1114 (if relaxed scrutiny applies, "there is no requirement that the rule is the only or the best way to further the proffered interests").

suggests it should qualify and Plaintiffs' counsel did not dispute, during oral argument, that it should qualify.[16]

### 4.   Conclusion

For the reasons stated above, Plaintiffs have not demonstrated a likelihood of success on the merits or even a substantial question going to the merits. This failure, standing alone, requires the denial of their request for a TRO.

### B.   **Irreparable Injury**

"A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of preliminary relief. Mere possibility of harm is not enough." *Enyart v. Nat. Conference of Bar Exam'rs*, 630 F.3d 1153, 1165 (9th Cir. 2011) (citation omitted).

The Court has already determined that Plaintiffs lack standing because it is speculative, as opposed to substantially likely, that the relief sought in their complaint would actually redress their injuries in light of their failure to challenge Article IV of the Arizona constitution. This means Plaintiffs also cannot demonstrate they will likely suffer irreparable injury in the absence of a TRO. *Cf. Hispanic Affairs Project v. Perez*, 141 F. Supp. 3d 60, 67 n.6 (D.D.C. 2015) ("Whether the requested injunctive relief can redress plaintiff Llacua's injuries . . . dovetails with consideration of the showing of irreparable harm . . . .").

Additionally, putting aside the Article IV issue, it is unclear whether each committee's inability to gather in-person signatures during the pandemic will cause it to fail to secure a place on the November 2020 ballot. As for AFE, it only gathered 110,333 signatures before March 11, 2020—which is only 46% of the required minimum figure of 237,645 and only 31% of the "buffer" figure of 356,468 provided by Mr. Gallaway—and the Court is dubious of Plaintiffs' assertion that AFE would have gathered 160,000

---

[16]   Instead, Plaintiffs' counsel disputed the State's contention that shifting to electronic signature gathering through the E-Qual system would result in less speech, arguing that E-Qual would result in meaningful exchanges of speech, too. But again, "there is no requirement that the rule is the only or the best way to further the proffered interests." *Dudum*, 640 F.3d at 1114.

additional signatures during the March/April timeframe.  The only evidence Plaintiffs have proffered in support of this anticipated increase in AFE's collection rate is the assertion in Mr. Gallaway's declaration that "[b]y the week of February 22, 2020, FieldWorks, on behalf of each Ballot Initiative Committee, was in full swing gathering signatures and ahead of schedule to meet the goals for obtaining a sufficient number of signatures."  (Doc. 79 ¶ 32.)   This assertion is conclusory and lacks foundation.  The Court has no basis for understanding what it means for a committee to be "in full swing" or why gathering only 31-46% of the required signatures during the first 16 months of a 20-month collection cycle could nevertheless be considered "ahead of schedule."  On these facts, Plaintiffs have not demonstrated that it is likely, as opposed to merely possible, that but-for the COVID-19 pandemic, AFE would have gathered at least 237,645 signatures, and perhaps as many as 356,468 signatures, by the July 2, 2020 cutoff and therefore qualified for the November 2020 ballot.

As for HRAZ, the issue is that it had already gathered 273,786 signatures before the COVID-19 restrictions came into force.  This is tens of thousands more than the required minimum figure.  Although the Court appreciates Mr. Gallaway's observation that prudent ballot initiative committees "should" obtain additional signatures, above and beyond the required figure, to account for the possibility that some of the signatures will be deemed invalid and stricken, this is not the same thing as cognizable evidence establishing a likelihood that HRAZ's 273,786 signatures will prove insufficient.  It would be inappropriate to issue a TRO based on speculation concerning its necessity.  *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").[17]

---

[17]   The Court appreciates the difficulty of demonstrating irreparable harm in this context—a committee with too few signatures cannot establish it, and neither can a relatively better-off committee that is seeking preliminary injunctive relief in an abundance of caution.  But this difficulty is a function of the TRO standards, which rightly recognize that because "[a] preliminary injunction is an extraordinary and drastic remedy," one "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Lopez,* 680 F.3d at 1072.

Finally, as for Ms. Turk, although the Court has already stated that it agrees with Plaintiffs' contention that the COVID-19 pandemic is currently interfering with the committees' ability to gather in-person signatures *en masse*, it doesn't follow that an injunction is required so Ms. Turk can personally sign the committees' petitions.  There is plenty of time between now and July 2, 2020 for Ms. Turk to make arrangements, while adhering to social distancing requirements, to sign each committee's petition in the presence of a circulator.

## C.      Balance of Equities

"[D]istrict courts must give serious consideration to the balance of equities."  *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (citation omitted).  In doing so, courts must consider "all of the competing interests at stake."  *Id.*

Plaintiffs' arguments concerning the balance-of-equities factor are all predicated on the assumption that the challenged provisions of Title 19 create a severe burden on Plaintiffs' First Amendment rights and will preclude Plaintiffs from qualifying for the November 2020 ballot.  (Doc. 2 at 13-15.)  But as discussed above, that assumption is unfounded.

On the other hand, a state "suffers an irreparable injury whenever an enactment of its people or their representatives is enjoined."  *Coal. For Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).  Additionally, it is significant that Plaintiffs are seeking to enjoin the State's election rules midway through the election cycle.  The Supreme Court has repeatedly instructed courts to exhibit caution when faced with such requests.  *See, e.g., Purcell*, 549 U.S. at 4 ("Faced with an application to enjoin operation of voter identification procedures just weeks before an election, the Court of Appeals was required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases . . . .").

At bottom, the balance-of-equities factor weighs against issuing a TRO.

## D.      Public Interest

When considering whether to grant preliminary injunctive relief, courts must

consider the requested injunction's impact on the public interest.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009).  When a proposed injunction is narrow and limited to the parties, the public interest "will be at most a neutral factor in the analysis."  *Id.* at 1139.  "If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequence, the public interest will be relevant to whether the district court grants the preliminary injunction."  *Id.*

Here, Plaintiffs seek an injunction that would apply to all "initiative and petition proponents and supporters."  (Doc. 2 at 2.)  Thus, the injunction they seek extends to the public at large.

The public interest weighs against issuing such a TRO.  Although the public has a strong interest in enacting laws through the initiative process, and although the Court is loathe to take any action (or inaction) that would expose Arizonans to an increased risk of harm during these challenging times, the signature requirements Plaintiffs seek to displace have been a part of Arizona's constitutional and electoral landscape for over a century. These requirements reflect a considered judgment, which has stood the test of time, about how best to prevent electoral fraud and promote civic engagement.  The public has a strong interest in the continued adherence to such requirements, even during challenging times.

The State has also explained that, due to unique features of Arizona law, it is extremely difficult to amend a law that was enacted via the initiative process.  (Doc. 77 at 10.)  This underscores the public's interest in adhering to a sound initiative process, with time-tested procedures to prevent fraud and promote civic engagement, in every election, not just every election except this one.

Finally, although Plaintiffs' complaint and moving papers suggest it would be easy for the Court to simply decree that the use of the E-Qual system is now permissible for initiative-related signature gathering, other parties paint a different and more complicated picture.  For example, the Secretary (who supports Plaintiffs' request) included in her response to the TRO motion a "request[] that the Court place certain limitations on the relief to minimize the administrative burden under the current circumstances," including

"specify[ing] whether the 5% sample of signatures required by A.R.S. § 19-121.01(B) to be randomly drawn from all signatures submitted for a petition should include E-Qual signatures or only those signatures submitted on a hard-copy petition sheet."  (Doc. 78 at 2, 8.)  During oral argument, the Secretary's counsel explained that further clarification was needed on this issue because there are two ways to draw the random sample but, if E-Qual signatures are considered presumptively valid, "it could make sense from a policy perspective" to require that samples be drawn only from the hard-copy signature sheets.  (Doc. 102 at 61.)  In response to this argument, counsel for the Maricopa County recorder (who takes no position on Plaintiffs' request) argued the Court shouldn't consider E-Qual signatures to be presumptively valid and instead should require the sample to be drawn from both sets of signatures.  (*Id.* at 64-65.)

A consistent theme in this order is that Plaintiffs' request raises significant federalism and separation-of-powers concerns.  This exchange underscores those concerns.  The people of Arizona, through their elected representatives (or, perhaps, through the initiative process), should be the ones making policy choices about how to draw signature samples and whether to treat signatures generated through the E-Qual system as presumptively valid.  The Court does not, in any way, fault the Secretary or the recorders for seeking clarification on those issues—it is appropriate and prudent to seek clarity so elections can run smoothly—but a federal judge should not be making those choices on the fly as part of a TRO proceeding.  The public's interest in having such policy choices made through appropriate channels is an additional factor weighing against relief.

Accordingly, **IT IS ORDERED** that:

(1)      Plaintiffs' complaint (Doc. 1) is **dismissed without prejudice** due to a lack of subject matter jurisdiction.

(2)      Plaintiffs' motion for a TRO (Doc. 2) is **denied as moot**.

(3)      The motion for reconsideration filed by the House Speaker and Senate President (Doc. 82) is **denied as moot**.

(4)      The State's conditional motion to certify questions to the Arizona Supreme

Court (Docs. 99, 100) is **denied as moot**.

(5)      The Clerk of Court shall terminate this action and enter judgment accordingly.[18]

Dated this 17th day of April, 2020.

_____
Dominic W. Lanza
United States District Judge

---

[18]      Although it might be appropriate, under other circumstances, to afford a plaintiff who has failed to establish standing an opportunity to amend the complaint in an attempt to cure the deficiency, Plaintiffs made clear during oral argument—and reaffirmed in a post-argument filing—that their intention is to challenge the Title 19 requirements without challenging Article IV of the Arizona constitution. (Doc. 101 at 1 ["Plaintiffs have not challenged Article IV, Part 1, Section 1(9). . . .   The Court does not need to rule on the application of Arizona's Constitution to E-Qual to decide this case.  Nor have Plaintiffs asked it to do so."]; Doc. 102 at 22 [Plaintiffs' confirmation during oral argument that the "omission from [Plaintiffs'] moving papers and complaint [of] any challenge to the constitutional provisions within the Arizona Constitution . . . was intentional"].).  Thus, granting leave to amend would be futile.  *Cf. Carrico v. San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011) ("Appellants' principal argument is that the allegations of their amended complaint are sufficient to confer standing . . . .  [T]hey do not . . . propose any specific allegations that might rectify their [lack of standing] . . . .  Accordingly, we deny leave to amend as futile.").  Additionally, because the dismissal of the complaint (like all dismissals based on a lack of jurisdiction) is without prejudice, Plaintiffs could re-file suit if a future decision by the Arizona Supreme Court in the parallel case changes the state-law landscape concerning redressability.

# EXHIBIT C

1   Israel G. Torres (#020303)
2   James E. Barton II (#023888)
    Jacqueline Mendez Soto (#022597)
3   TORRES LAW GROUP, PLLC
    2239 West Baseline Road
4   Tempe, Arizona 85283
5   (480) 588-6120
    James@TheTorresFirm.com
6   Jacqueline@TheTorresFirm.com
7   *Attorneys for Plaintiffs*

8                    UNITED STATES DISTRICT COURT
9
10                   FOR THE DISTRICT OF ARIZONA
11

12  Arizonans for Fair Elections (AZAN),          Case No.: 2:20-cv-00658-DWL
    *et al.*;
13
                            Plaintiffs,                **STATEMENT OF**
14                                                    **REPRESENTATION**
                    v.
15
16  Katie Hobbs, Arizona Secretary of
    State, *et al.*, in their official capacities,
17
                            Defendants.
18
19
20          Pursuant to Federal Rule of Appellate Procedure 12(b), Ninth Circuit Rule 3-2(b)
21  and the Notice of Appeal filed concurrently with this statement, attorneys for Plaintiff-
22  Appellants provide the following list of the parties to this action and identify their counsel
23  by name, firm, address, telephone number, and email address:
24
25          **Attorney for Plaintiffs**
26          James E. Barton II
27          Jacqueline Mendez Soto
            Torres Law Group, PLLC
28          2239 West Baseline Road

Tempe, Arizona 85283
(480) 588-6120
james@thetorresfirm.com
Jacqueline@TheTorresFirm.com

*Attorneys for Plaintiffs Arizonans for Fair Elections (AZAN), an Arizona nonprofit corporation, Arizonans Fed Up with Failing Healthcare (Healthcare Rising AZ) an Arizona nonprofit corporation, and Randi L. Turk, an individual*

**<u>Attorneys for Defendants</u>**

Roy Herrera
Daniel A. Arellano
Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004
(602) 798-5400
herrerar@ballardspahr.com
arellanod@ballardspahr.com
andrewsj@ballardsparh.com
*Attorneys for Katie Hobbs, Secretary of State*

Joseph Young
Apache County Attorney's Office
Post Office Box 637
St. Johns, Arizona 85936
(928) 337-7560
JYoung@Apachelaw.net
*Attorney for Defendant Edison Wauneka, Apache County Recorder*

Britt W. Hanson
Christine J. Roberts
Cochise County Attorney
Post Office Drawer CA
Bisbee, Arizona 85603
(520) 432-8700
CVAttmeo@cochise.az.gov
*Attorneys for Defendant David Stevens, Cochise County Recorder*

Rose M. Winkeler
Coconino County Attorney
110 East Cherry Avenue

Flagstaff, Arizona 86001
(928) 679-8200
rwinkeler@coconino.az.gov
*Attorney for Defendant Patty Hansen, Coconino County Recorder*

Jeff Dalton
Gila County Attorney's Office
1400 East Ash Street
Globe, Arizona 85501
(928-402-8630
jdalton@gilacountyaz.gov
*Attorney for Sadie Jo Bingham Gila County Defendants*

Kenneth Angle
Graham County Attorney's Office
800 West Main Street
Safford, Arizona 85546
(928) 428-3620
kangle@graham.az.gov
*Attorney for Wendy John, Graham County Recorder*

Jeremy Ford
Greenlee County Attorney's Office
Post Office Box 1717
Clifton, Arizona 85533
(928) 865-2072
jford@co.greenlee.az.us
*Attorney for Sharie Milheiro, Greenlee County Recorder*

Tony Rogers
La Paz County Attorney's Office
1320 Kofa Avenue
Parker Arizona 85344
(928) 669-6118
trogers@lapazcountyaz.org
*Attorney for Defendant Richard Garcia, La Paz County Recorder*

Joseph E. La Rue
Joseph Branco
Maricopa County Attorney's Office
Civil Services Division
222 North Central Avenue, Suite 1100
Phoenix, Arizona 85004

(602) 506-8541
laruej@mcao.maricopa.gov
branco@mcao.maricopa.gov
*Attorneys for Adrian Fontes, Maricopa County Recorder*

Jeffrey B. Haws
Mohave County Attorney's Office
315 North 4th Street
Post Office Box 7000
Kingman, Arizona 86402
(928) 753-0770
Jeff.Haws@mohavecounty.us
*Attorney for Defendant Kristi Blair, Mohave County Recorder*

Brad Carlyon
Jason S. Moore
Navajo County Attorney's Office
Post Office Box 668
Holbrook, AZ 86025
(928) 524-4026
Jason.moore@navajocountyaz.gov
*Attorneys for Doris Clark, Navajo County Recorder*

Daniel Jurkowitz
Pima County Attorney's Office, Civil Division
32 North Stonve Avenue, Suite 2100
Tucson, Arizona 85701
(520) 724-5700
Daniel.jurkowitz@pcao.pima.gov
*Attorney for Defendant F. Ann Rodriguez, Pima County Recorder*

Kent Volkmer
Craig Cameron
Pinal County Attorney
Post Office Box 887
Florence, AZ 85132
(520) 866-6466
Craig.cameron@pinalcountyaz.gov
*Attorneys for Defendant Virginia Ross, Pima County Recorder*

Kimberly Hunley
Santa Cruz County Attorney's Office
2150 North Congress Drive, #201

4

Nogales, Arizona 85621
(520) 375-7780
khunley@santacruzcountyaz.gov
*Attorney for Defendant Suzanne Sainz, Santa Cruz County Recorder*

Thomas M. Stoxen
Yavapai County Attorney's Office
255 East Gurley Street
Prescott, Arizona 86301
(928) 777-7143
Thomas.Stoxen@yavapai.us
*Attorney for Defendant Yavapai County Recorder*

William J. Kerekes
Office of the Yuma County Attorney
250 West Second Street, Suite G
Yuma, Arizona 85364
(928) 817-4300
YCAttyCivil@yumacountyaz.gov
*Attorney for Defendant Robyn Pouquette, Yuma County Recorder*

DATED: April 20, 2020

TORRES LAW GROUP, PLLC


/s/James E. Barton II
James E. Barton II
Jacqueline Mendez Soto
*Attorneys for Plaintiffs*